Nos. 09-10172 and 09-10179

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**UNITED STATES OF AMERICA**,

Plaintiff-Appellee,

v.

**ALLEN HARROD,**

**MICHAEL LABRECQUE**,

Defendants-Appellants.

On Appeal From The United States District Court
For The Eastern District of California

Honorable William B. Shubb
United States District Judge

U.S. D.C. No. 03-CR-00384-WBS

---

# JOINT BRIEF OF APPELLANTS

---

JOHN P. BALAZS
Attorney At Law
916 2nd Street, Suite F
Sacramento, California 95814
Telephone: (916) 447-9299
John@Balazslaw.com

Attorney for Defendant-Appellant
ALLEN HARROD

DANIEL J. BRODERICK
Federal Defender
CAROLYN M. WIGGIN
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone: (916) 498-5700

Attorneys for Defendant-Appellant
MICHAEL LABRECQUE

Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

I.   Jurisdictional Statement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.   Subject Matter Jurisdiction in the District Court.  . . . . . . . . . . . . . . 1

     B.   Jurisdiction in the Court of Appeals.  . . . . . . . . . . . . . . . . . . . . . . . 1

     C.   Appealability of District Court Order and
          Timeliness of the Appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  Bail Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. Statement of Issues Presented for Review  . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Whether The Evidence Was Insufficient To Support Convictions
          On Counts Two And Three Because The Government Failed To
          Prove That At The Time Irene Harrod Took Sexually Explicit
          Photos Of J. Harrod, Allen Harrod had Transferred Custody Or
          Control Of J. Harrod To, Or That Michael LaBrecque Had Gained
          Custody Or Control Of, J. Harrod.  . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.   Whether The Evidence Was Insufficient To Support Convictions
          On Counts Two And Three Because The Government Failed To
          Prove That Any Transfer Of Custody Or Control Of J. Harrod
          From The Harrods to The LaBrecques Was Causally Related to
          The Production Of Sexually Explicit Photographs of J. Harrod. . . . . 3

     C.   Whether The Evidence Was Insufficient To Support Conviction
          of Michael LaBrecque On Count One Because There Was No
          Evidence That He Acted With The Intent That J. Harrod Engage
          In Illegal Sexual Conduct.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     D.   Whether the District Court Erred In Imposing 15-Year Terms
          Of Imprisonment On Counts One And Seven On Mr. Harrod And
          Mr. LaBrecque When The Statutory Maximum Penalty At The
          Time Of The Offense Charged In Those Counts Was Only 10
          Years Imprisonment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     E.   Whether The District Court Erred In Imposing $25,000 Fines
          On Mr. Harrod And Mr. LaBrecque.  . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  Statement of the Case  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.   Course of Proceedings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

i

C.    Disposition Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    1.    Conviction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    2.    Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.    Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

A.    The Evidence Was Insufficient to Support Convictions for Counts Two and Three Because The Government Failed to Prove That at the Time Irene Harrod Took Sexually Explicit Pictures of J. Harrod, Allen Harrod Had Transferred Custody or Control of J. Harrod to, or That Michael LaBrecque Had Gained Custody or Control of, J. Harrod. . . . . . . . . . . . . . . . . 18

    1.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    2.    Mr. Harrod's Conviction for Count Two and Mr. LaBrecque's Conviction for Count Three Must Be Reversed Because the Evidence Showed That Irene Harrod Had Custody and Control of J. Harrod at the Time the Sexually Explicit Photographs Were Taken. . . . . . 18

B.    The Evidence Was Insufficient to Support Convictions for Counts Two and Three Because The Government Failed to Prove That Any Transfer of Custody or Control of J. Harrod from the Harrods to the LaBrecques Was Causally Related to the Production of Sexually Explicit Photographs of J. Harrod. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    1.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    2.    Mr. Harrod's Conviction for Count Two and Mr. LaBrecque's Conviction for Count Three Must Be Reversed Because There Was No Evidence that Sexually Explicit Photographs Were Taken of J. Harrod "As a Consequence" of Any Transfer of Custody. . . . . . . . . . . . . 26

C.    The Evidence Was Insufficient to Support Conviction of Michael LaBrecque on Count One Because There Was No Evidence That Michael LaBrecque Acted with the Intent That J. Harrod Engage in Illegal Sexual Conduct. . . . . . . . . . . . . . . . . . . 30

    1.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

2.    Mr. LaBrecque's Conviction for Count One Must Be Reversed Because There Was No Evidence That He Assisted in Arranging for J. Harrod's 1991 Trip from California to Texas with the Intent that J. Harrod Participate in Illegal Sexual Conduct While in Texas. . . . . . 30

D.    The District Court Erred In Sentencing Mr. Harrod and Mr. LaBrecque to 15 Years Imprisonment On Counts One And Seven When The Statutory Maximum For Those Counts Was Only 10 Years Imprisonment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

E.    The Court Erred in Imposing $25,000 Fines on Both Mr. Harrod and Mr. LaBrecque. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2.    In Light of Mr. Harrod's and Mr. LaBrecque's Indigence and Competing Financial Obligations, the District Court Clearly Erred in Imposing $25,000 Fines. . . . . . . . . . 36

VIII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iii

Table of Authorities

United States Constitution

United States Constitution Article I, Section 9, Clause 3  . . . . . . . . . . . . . . . . . . 35


Federal Cases

*CNG Transmission Mgmt. VEBA v. United States,*
    588 F.3d 1376 (Fed. Cir. 2009)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Cummings v. Missouri,* 4 Wall. 277 (1867)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Free Speech Coalition v. Reno,* 198 F.3d 1083 (9th Cir. 1999),
    *aff'd sub nom. Ashcroft v. Free Speech Coalition,* 535 U.S. 234 (2002) . . 28

*Harrod v. U.S. Dist. Court,* 551 U.S. 1133 (2007) . . . . . . . . . . . . . . . . . . . . . . . 6

*Jackson v. Virginia,* 443 U.S. 307 (1979)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*See United States v. Rearden,* 349 F.3d 608 (9th Cir. 2003). . . . . . . . . . . . . . . . 35

*United States v. Buculei,* 262 F.3d 322 (4th Cir. 2001)  . . . . . . . . . . . . . . . . . . . 20

*United States v. Cabaccang,* 332 F.3d 622 (9th Cir. 2003) (*en banc*)  . . . . . . . 30

*United States v. Carty,* 520 F.3d 984 (9th Cir. 2008) (*en banc*),
    *cert. denied sub nom. Zavala v. United States,* __ U.S. __,
    128 S.Ct. 2491 (May 19, 2008).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Cole,* 262 F.3d 704 (8th Cir. 2001)  . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Eureka Labs., Inc.,* 103 F.3d 908 (9th Cir.1996) . . . . . . . . . . . 37

*United States v. Granderson,* 511 U.S. 39 (1994)  . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Harrell,* 530 F.3d 1051 (9th Cir. 2008)  . . . . . . . . . . . . . . . . . . 29

*United States v. Inunza,* 580 F.3d 894 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 18

*United States v. Johnson,* 132 F.3d 1279 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . 31

*United States v. LaGrou Distrib. Sys., Inc.,* 466 F.3d 585 (7th Cir. 2006)  . . . . . 37

*United States v. Orlando,* 553 F.3d 1235 (9th Cir. 2009)  . . . . . . . . . . . . . . . . . . 37

*United States v. Rodriguez-Lara,* 421 F.3d 932 (9th Cir. 2005)  . . . . . . . . . . . . . 34

*United States v. Sager*, 227 F.3d 1138 (9th Cir. 2000),
    *cert. denied*, 531 U.S. 1095 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. U.S. District Court for the Eastern District of California*,
    464 F.3d 1065 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Vik*, 655 F.2d 878 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 31

Federal Statutes

18 United States Code Section 2251A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 United States Code Section 2256(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

18 United States Code Section 2423 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17, 31

18 United States Code Section 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 United States Code Section 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 United States Code Section 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 United States Code Section 3571 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

18 United States Code Section 3752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

28 United States Code Section 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Child Protection and Obscenity Enforcement Act of 1988,
    Pub. L. No. 100-690, 102 Stat. 4181
    (codified at 18 United States Code Section 2251A) . . . . . . . . . . . . . . . . . 27

Protection of Children from Sexual Predators Act of 1998,
    Pub. L. No. 105-314, Title I, § 103, 112 Stat. 2976
    (codified at United States Code Section § 2423(a)). . . . . . . . . . . . . . . . . . 35

Federal Rules

Federal Rules of Appellate Procedure, Rule 4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . 2

State Statutes

California Penal Code Section 1202.4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

v

United States Sentencing Guidelines

United States Sentencing Guidelines Section 5E1.2  . . . . . . . . . . . . . . . . . . . . 36, 37

Legislative Materials

134 Cong. Rec. S13326-01, 1988 WL 176238 . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

134 Cong. Rec. S13418-04, 1988 WL 176516 . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Nos. 09-10172 and 09-10179

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. Cr. 2:03-cr-00384-WBS |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | JOINT BRIEF OF APPELLANTS |
| | ) | |
| ALLEN HARROD, and | ) | |
| MICHAEL LABRECQUE, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

## I. Jurisdictional Statement

### A. Subject Matter Jurisdiction in the District Court.

Defendants-Appellants Allen Harrod and Michael LaBrecque were charged in a nine-count second superseding indictment with various violations of Title 18 of the United States Code. The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

### B. Jurisdiction in the Court of Appeals.

This is a direct appeal from a final decision of a United States District Court entering its judgment of a criminal conviction and sentence. This Court has jurisdiction of the appeal under 28 U.S.C. §1291.

1

### C.  Appealability of District Court Order and Timeliness of the Appeal.

The district court filed and entered the final judgments in this case on April 24, 2009.  ER Vol. 3, pp. 377-86, CR 305 and 306.[1]  Mr. LaBrecque filed his Notice of Appeal on April 24, 2009.  ER Vol. 3, p. 387, CR 307.  Mr. Harrod filed his Notice of Appeal on April 28, 2009.  ER Vol. 3, p. 388, CR 310.  The appeals are timely under Rule 4(b)(1) of the Federal Rules of Appellate Procedure.

## II.  Bail Status

Mr. Harrod is currently in the custody of the California Department of Corrections and Rehabilitation, where he is serving a life term, which will be followed by a federal term of 1,080 months and a concurrent life term for this case.  Mr. LaBrecque is in the custody of the United States Bureau of Prisons and is serving a term of 1,080 months and a concurrent life term for this case, which will be followed by California state prison term of 105-years-to-life.

---

[1]  Throughout this brief, "ER Vol." refers to the volume of the Excerpts of Records to which the brief cites, and "CR" refers to the district court clerk's docket number.

**III.  Statement of Issues Presented for Review**

**A.**  Whether The Evidence Was Insufficient To Support Convictions On Counts Two And Three Because The Government Failed To Prove That At The Time Irene Harrod Took Sexually Explicit Photos Of J. Harrod, Allen Harrod had Transferred Custody Or Control Of J. Harrod To, Or That Michael LaBrecque Had Gained Custody Or Control Of, J. Harrod.

**B.**  Whether The Evidence Was Insufficient To Support Convictions On Counts Two And Three Because The Government Failed To Prove That Any Transfer Of Custody Or Control Of J. Harrod From The Harrods to The LaBrecques Was Causally Related to The Production Of Sexually Explicit Photographs of J. Harrod.

**C.**  Whether The Evidence Was Insufficient To Support Conviction of Michael LaBrecque On Count One Because There Was No Evidence That He Acted With The Intent That J. Harrod Engage In Illegal Sexual Conduct.

**D.**  Whether the District Court Erred In Imposing 15-Year Terms Of Imprisonment On Counts One And Seven On Mr. Harrod And Mr. LaBrecque When The Statutory Maximum Penalty At The Time Of The Offense Charged In Those Counts Was Only 10 Years Imprisonment.

**E.**  Whether The District Court Erred In Imposing $25,000 Fines On Mr. Harrod And Mr. LaBrecque.

**IV.  Statement of the Case**

**A.  Nature of the Case**

This is a criminal case in which co-defendants Allen Harrod, Irene Harrod,[2] Michael LaBrecque, and Juliette LaBrecque were charged in a second superseding indictment filed May 6, 2004, with a total of nine counts involving, generally, interstate transportation related to sexual misconduct with five children.  ER Vol. 2, pp. 74-81, CR 47.  The counts can roughly be separated into Counts One through Three, which involved "Victim 3" or "J. Harrod," the son of Allen and

---

[2]  Irene Harrod was also named as Irene Hunt in the indictment.  She was the common law wife of Allen Harrod during the time covered by the criminal charges and is referred to as Irene Harrod in this brief.

Irene Harrod; and Counts Four through Eight, which involved "Victim 1," or "S. LaBrecque," "Victim 2," or "K. LaBrecque," and "Victim 4," or "T. LaBrecque," daughters of Michael and Juliette LaBrecque.[3] Count Nine, which involved "Victim 5," or "A. Harrod," resulted in a hung jury.

Counts One through Three involve charges that starting in 1991 and continuing through 2001, the co-defendants were involved in arranging for J. Harrod, who was seven years old in 1991, to travel from California to Texas for the purpose of engaging in illegal sexual activity. Specifically, Count One charged that between July 1, 1991, and September 1, 1991, Allen Harrod, Michael LaBrecque, and Juliette LaBrecque aided and abetted the interstate travel of J. Harrod with the intent that he engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a). Count Two charged that between July 1, 1991, and October 4, 2001, Irene Hunt and Allen Harrod sold and transferred custody and control of J. Harrod with the knowledge that as a result of that sale and transfer J. Harrod would be portrayed in a sexually explicit image, in violation of 18 U.S.C. § 2251A(a)(1) and (2). Count Three charged that between July 1, 1991, and October 4, 1991, Michael LaBrecque and Juliette LaBrecque purchased and obtained custody and control of J. Harrod with knowledge that as a consequence of that transfer, J. Harrod would be portrayed in a sexually explicit image, in violation of 18 U.S.C. § 2251A(b)(1) and (2).

Counts Four through Eight involved various trips that three LaBrecque daughters made from Texas to California between 1998 and 2001. Each of the

---

[3]    Because the victims were minors at the time of the charged offenses, the parties generally used the first letter of the victims' first names rather than their full names. This brief continues that practice.

counts charged that Allen Harrod, Irene Harrod, and Michael LaBrecque transported or aided and abetted the transportation of a LaBrecque daughter from Texas to California with the intent that the girl engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a).

### B. Course of Proceedings

On September 22, 2003, Mr. LaBrecque was arraigned in federal district court and submitted CJA Form 23, his financial affidavit. ER Vol. 3, p. 372, CR 11. Although it showed that Mr. LaBrecque and his wife had income from employment, by the time the form was submitted both were incarcerated and thus no longer working. The form also showed that Mr. LaBrecque had no real estate and owned some used cars worth a total of approximately $5,000. Finally the form showed that he supported eight children and grandchildren and had approximately $1,020 in monthly expenses. The magistrate judge deemed Mr. LaBrecque indigent and appointed the Office of the Federal Defender to represent him. CR 7.

Mr. Harrod was arraigned on February 26, 2004, and submitted his CJA Form 23 financial affidavit on April 16, 2004. ER Vol. 3, p. 371, CR 43. Mr. Harrod's financial affidavit showed that neither he nor his wife had any income from employment, and that he had received a total of $1,000 in the past 12 months, and all but $200 of that amount went towards child support. Mr. Harrod had no property of any kind, eight dependents, and various debts amounting to $20,000. The magistrate judge deemed Mr. Harrod indigent and appointed an attorney from the district's Criminal Justice Act panel to represent him. CR 42.

The Second Superseding Indictment described above was filed May 6, 2004. ER Vol. 2, pp. 74-81, CR 47. On May 21, 2004, all four co-defendants

5

entered pleas of not guilty. On February 17, 2006, Irene Harrod pled guilty to Count Two of the indictment and agreed to cooperate with the government in exchange for dismissal of all of the other counts pending against her. As part of the plea agreement, the government agreed to recommend that Irene Harrod be allowed to serve her federal sentence concurrent to the state sentence which had already been imposed, and that she be allowed to serve the sentence in a federal facility. ER Vol. 2, p. 196, RT of trial, p. 2239.

On April 10, 2006, Allen Harrod moved to waive jury trial and to be tried by a judge largely on the ground that, due to the horrific nature of the charges and the evidence of child molestations by the defendants, no jury could fairly consider their legal arguments that the government could not prove knowledge and intent at the time the children were transported in interstate commerce. His two co-defendants, Michael and Juliette LaBrecque, also filed waivers of their right to jury trial and joined in the motion to be tried by the district judge. Over the objection of the government, the district court granted the defendants their request to waive jury. The government petitioned this Court for a writ of mandamus to require the district court to hold a trial by jury, rather than by judge. In an opinion filed October 3, 2006, this Court granted the writ of mandamus and ordered the defendants tried by a jury. *United States v. U.S. District Court for the Eastern District of California*, 464 F.3d 1065 (9th Cir. 2006). The defendants' petition for writ of certiorari was denied by the U.S. Supreme Court on June 18, 2007. *Harrod v. U.S. Dist. Court*, 551 U.S. 1133 (2007). Thereafter, the defendants were tried by jury.

### C.    Disposition Below

#### 1.    Conviction

After a jury trial, Mr. Harrod was convicted of Counts One, Two, and Four through Eight.  Mr. LaBrecque was convicted of Counts One, Three, and Four through Eight.  The jury hung as to Counts One and Three against Juliette LaBrecque and as to Count Nine against Michael LaBrecque, and eventually the government dismissed these charges.

#### 2.    Sentencing

In Mr. Harrod's Presentence Report, the probation officer noted that Mr. Harrod stated that he received $900 per month from his military retirement.  Harrod PSR, at ¶¶ 152-53.  The report also stated:

> The issue of restitution is continuing to be investigated.  Since the status of the military pension is unknown and no information was provided by the defendant regarding his financial condition, it is believed a fine should be imposed, as the defendant has not demonstrated an inability to pay a fine.  The guideline fine range is $25,000 to $250,000.  A fine of $25,000 is recommended.

Harrod PSR, at ¶ 154.

In Mr. LaBrecque's Presentence Report, the probation officer observed that at some point in time Mr. LaBrecque had told a pretrial services officer that he owned a truck and two older cars.  The probation officer noted that defense counsel had informed her that the cars had been sold.  LaBrecque PSR ¶ 146.  On the question of whether Mr. LaBrecque should be required to pay a fine, the probation officer stated:

> The issue of restitution is continuing to be investigated.  Since no information was provided by the defendant regarding his background and financial condition, it is believed a fine should be imposed, as the defendant has not demonstrated an inability to pay a fine.  The guideline fine range is $25,000 to $250,000.  A fine of $25,000 is recommended.

7

PSR ¶ 147.

Both Mr. Harrod and Mr. LaBrecque objected to imposition of a fine. In his formal objections to the advisory presentence report, Mr. Harrod stated:

> With respect to paragraph 154, the defendant did provide Sacramento County Probation with his financial condition. He receives a military pension and has no other assets. Therefore, he is not in a position to pay a fine and the fine should not be imposed. Additionally, Mr. Harrod is responsible for child support for the child of A[.] Labrecque and his military pension is barely sufficient for that purpose.

ER Vol. 3, pp. 376, CR 276. In addition, Mr. Harrod had been convicted of related offenses in Sacramento County Superior Court, and in 2004 he was sentenced in that case to serve a life term and ordered to pay a $10,000 "restitution fine" under California Penal Code Section 1202.4(b).[4]

In Mr. LaBrecque's Motion to Correct the Presentence Report, Mr. LaBrecque stated that he

> objects to imposition of a $25,000.00 fine. Paragraph 147. The court can infer from [the] fact that the Federal Defender[]'s Office was appointed to represent Mr. LaBrecque following his sworn completion of a financial affidavit, that he has insufficient assets to pay such a fine.

CR 274, p. 6.

In the responses it filed to objections submitted by Mr. Harrod and Mr. LaBrecque, the government did not challenge their assertions that they did not have the resources to pay fines, and it made no argument supporting imposition of a fine.

---

[4] Mr. Harrod is in the process of getting the formal abstract of judgment from his state conviction, and this document will show that he was ordered to pay the $10,000 restitution fine. Once this abstract of judgment is received, Defendants will file a Request to Take Judicial Notice of the document with the document attached.

After Mr. LaBrecque was convicted in federal court but before he was sentenced, he was tried and convicted in Sacramento Superior Court for charges related to sexual abuse of daughters in the Harrod and LaBrecque families. On April 10, 2009, Mr. LaBrecque was sentenced in that case, and his sentence included a $10,000 "restitution fine" pursuant to California Penal Code § 1202.4(b). *See* simultaneously-filed Defendant-Appellant's Request to Take Judicial Notice, attaching the abstract of judgment for Mr. LaBrecque's conviction in Sacramento County Superior Court.

At the sentencing hearing held on April 20, 2009, the court asked the government for its position regarding the fine. Government counsel stated that the government had very little information regarding the financial holdings of Mr. Harrod and Mr. LaBrecque and observed that Mr. Harrod had been in custody since 2001 and Mr. LaBrecque had been in custody since 2003. ER Vol. 1, p. 70, RT, 4/20/09, p. 71. The court then had the following interchange with Mr. LaBrecque's counsel:

> THE COURT: Well, Ms. Marks, if no financial information is provided, how can you expect the Court to make an intelligent determination as to whether he can afford to pay a fine?
>
> MS. MARKS: Well, the Court can certainly make part of its determination on the fact that he's going to be in prison at least through this court –
>
> THE COURT: No, but he may have some holdings. You see, as I understand the fine provisions, there is if not a presumption, there is an inference that the defendant should pay a fine. And when the Court doesn't impose a fine it's because the Court makes a finding that the defendant is unable to pay a fine. If you don't give the Court any information as to whether the defendant is or is not able to pay a fine, why shouldn't the Court impose the fine?
>
> MS. MARKS: Well, Your Honor, Mr. LaBrecque has been advised not only by me but by other attorneys not to give any information at all while the possibility of appeal exists.

9

> THE COURT: Well, there's a difference between him talking and you giving the Court information about his financial status.
>
> MS. MARKS: Well, Your Honor, he qualified for the Federal Defender, and he owns no property, and that information was given to probation. That seems to me to be enough.
>
> THE COURT: Well, but if he walked into the Federal Defender's office or you walk into his cell and he said he couldn't afford a fee, you'd probably represent him. That doesn't mean that he's giving you all the information that's available.

ER Vol. 1, pp. 70-71, RT, 4/20/09, pp. 71-72. The court went on to impose the $25,000 fine on both defendants without further comment. ER Vol. 1, pp. 72-73, RT, 4/20/09, pp. 77-78,

Mr. Harrod was sentenced to 180 months as to Counts One and Four through Eight, to be served consecutively to each other for a total term of 1,080 months, and life as to Count Two, to be served concurrently to punishment for the other counts, for a total term of life. He was also ordered to pay $700 in special assessments and a $25,000 fine. ER Vol. 1, p. 72, RT, 4/20/09, at 77. Mr. LaBrecque was sentenced to 180 months as to Counts One and Four through Eight, to be served consecutively to each other for a total term of 1,080 months, and life as to Count Three, to be served concurrently to punishment for the other counts, for a total term of life. He was also ordered to pay $700 in special assessments and a $25,000 fine. ER Vol. 1, p. 73, RT, 4/20/09, at 78.

## V.      Statement of Facts

In a Second Superseding Indictment, the government charged defendants Allen Harrod, Irene Harrod, Michael LaBrecque, and Juliette LaBrecque with a number of counts generally involving the interstate transportation of the Harrods' son J. and four of the LaBrecque's daughters for sexual misconduct. Irene Harrod pled guilty and testified for the government at the trial of the other three

defendants.  The jury hung on the two charges against Juliette LaBrecque and the government later dismissed those charges.  In this joint appeal, Allen Harrod and Michael LaBrecque challenge the sufficiency of the evidence on counts one through three, which all involve the Harrods' son J. Harrod.  This statement of facts is generally limited to facts relevant to those three counts.

Michael LaBrecque and Allen Harrod had been friends since the early 1980s.  RT of trial, p. 1757, 1903.  Irene Harrod began living with Allen Harrod in 1983 when she moved into the home Allen Harrod shared with his wife--and Irene's sister--Illa Harrod.  ER Vol. 2, p. 97, RT of trial, p. 1925.  At that time, both Irene Harrod and Allen Harrod were practicing the Mormon religion.  ER Vol. 2, pp. 100-01, RT of trial, pp. 1928-29.

Some time during 1983, Allen and Irene Harrod left the Mormon church and Allen told Irene that he would teach her what she needed to know about religion. ER Vol. 2, p. 101, RT of trial p. 1929.   Allen Harrod then created a new "religion" of which he was the leader.  ER Vol. 2, p. 108, RT of trial p. 1936.  That same year, Allen and Irene Harrod started teaching Michael and Juliette LaBrecque about their new religion. ER Vol. 2, pp. 107-09, RT of trial, pp. 1935-37.  As part of the religion, Allen Harrod, Irene Harrod, Michael LaBrecque, and Juliette LaBrecque went through two rituals known as "indications."  In the first "indication," Allen Harrod watched Michael and Juliette have sexual intercourse at their home on Mather Air Force Base.  ER Vol. 2, p. 117, RT of trial, p. 1945. In the second indication, Juliette LaBrecque went through some sort of sexual ritual at the Harrod's home.  *Id.*  Neither the "indications" involved children.  *Id.*

The new religion created by Allen Harrod included a practice or ritual called the "presentation."   Irene Harrod first learned about the "presentation" in 1983.

11

ER Vol. 2, p. 110, RT of trial, pp. 1938. Only girls went through the
"presentation." ER Vol. 2, p. 113, RT of trial, p. 1941. According to Allen
Harrod's "teaching," a girl was supposed to be taught how to perform oral sex
from ages eight until approximately 12 years old. ER Vol. 2, pp. 111-13, 115, RT
of trial, pp. 1939-1941, 1943. At 12 years old, or when a girl started menstruating,
her "presentation" began. ER Vol. 2, pp. 111-12, RT of trial, pp. 1939-40. The
"presentation" required a girl to complete a series of sex acts with the patriarch
(Allen Harrod) involving oral copulation, followed by vaginal and anal
intercourse. ER Vol. 2, p. 112, RT of trial, p. 1940; RT of trial, pp. 2055, 2075.
Allen Harrod told Michael LaBrecque about the "presentation" by early 1991. ER
Vol. 2, pp. 113-14, 119, 135-36, RT of trial, pp. 1941-42, 1947, 1963-64. With
respect to counts four through eight, much of the evidence at trial concerned "the
presentations" carried out by the Harrod and LaBrecque families with a LaBrecque
daughter traveling to California and engaging in a number of sexual acts with
Allen Harrod to complete her presentation.

In 1991, the Harrods decided that their son, J. Harrod, should go to Texas
to be home-schooled by Juliette LaBrecque. ER Vol. 2, pp. 140-41, RT of trial,
pp. 1968-69. At the time, J. Harrod was seven years old and had just completed
first grade when his teacher advised that he be placed into a special education
program. ER Vol. 2, p. 141, RT of trial, p. 1969. Irene Harrod had been in a
special education program when she was a child. As a result, she felt she had been
branded as "basically dumb" and she did not want J. Harrod to go through the
same experience. ER Vol. 2, p. 142, RT of trial, p. 1970.

A day or two before Irene Harrod left California for Texas with J. Harrod,
Allen Harrod told her that she should take pictures of J. Harrod and Juliette

LaBrecque in sexual positions while Irene was in Texas.  ER Vol. 2, p. 143, 202, RT of trial, pp. 1971, 2245.  Allen Harrod wanted the pictures for "reassurance," so that if Juliette LaBrecque "ever left the church and told authorities, he would have something to hold on her."  ER Vol. 2, p. 143, RT of trial, p. 1971:16-17.

Irene Harrod did not take a camera with her to Texas because Allen Harrod told her there would be a Polaroid camera she could use at the LaBrecque home in Texas.  ER Vol. 2, p. 145, RT of trial, p. 1973.  After she had taken the photos, Allen Harrod told Irene that she should hand them over to Michael LaBrecque. ER Vol. 2, p. 145, RT of trial, p. 1973.

When officers searched Allen Harrod's residence on October 4, 2001, in connection with his arrest on state child molestation charges, officers seized a number of journals and computer disks.  A FBI analyst testified that he believed some journal entries were written by Mr. Harrod and others by Mr. LaBrecque. RT of trial, pp.  2756-57.  In Mr. LaBrecque's journal entries, he indicated that he masturbated in the shower "with a little help from" his five-year-old daughter K. on May 25, 1991 and July 14, 1991.   ER Vol. 2, pp. 189-92, RT of trial, p. 2044-47.

On July 31, 1991, Irene Harrod flew with her son J. Harrod and another infant son from California to Texas.   ER Vol. 2, p. 147, RT of trial, p. 1975.  Irene Harrod planned on spending one month in Texas with her son J. Harrod remaining in Texas until he completed high school.   ER Vol. 2, p. 150, RT of trial, p. 1978. At the LaBrecques' home in Texas, Irene and J. Harrod settled into a routine that involved Juliette LaBrecque home-schooling J. Harrod during the day.  ER Vol. 2, p. 164, RT of trial Vol. 10, p. 1992.

During the month that Irene Harrod spent at the LaBrecque's home, she

13

urged both Michael and Juliette LaBrecque to inform her what "level of wine" they wanted to take. ER Vol. 2, pp. 293-94, RT of trial, p. 2336-37. Irene Harrod explained that "level of wine" meant sexual acts or sexual acts with a child. ER Vol. 2, pp. 297-98, RT of trial, pp. 2340-41. Allen and Irene Harrod were becoming frustrated because Michael and Juliette LaBrecque could not decide whether to have sexual contact with children. ER Vol. 2, p. 298, RT of trial, p. 2341.

About two weeks after Irene and J. Harrod arrived at the LaBrecque home, Irene took the pornographic photographs of J. Harrod and Juliette LaBrecque that Allen Harrod had asked her to take. ER Vol. 2, pp. 165-66, RT of trial, pp. 1993-94. She used the family's camera that was on an open shelf in the library. ER Vol. 2, pp. 167-68, RT of trial, p. 1995-96. Michael LaBrecque had bought film for the camera during Irene's visit. ER Vol. 2, pp. 167, 309, RT of trial, pp. 1995, 2358. Irene Harrod did not tell Juliette or Michael LaBrecque in advance that she was planning to take the pictures; she simply told Juliette LaBrecque and J. Harrod that they needed to go upstairs. ER Vol. 2, pp. 170-71, 201, 210, RT of trial pp. 1998-1999, 2244, 2253. The three entered the LaBrecques' upstairs bedroom, and proceeded to take photos of J. Harrod and Juliette LaBrecque in sexually explicit poses. Irene Harrod directed the action, telling them what poses to get into for the photo session. ER Vol. 2, pp. 313, 317-18, RT of trial, pp. 2399, 2403-04. During the session, Juliette LaBrecque was silent and compliant. ER Vol. 2, p. 181, RT of trial Vol. 10, p. 2008. J. Harrod obeyed Irene Harrod because she was his mother. ER Vol. 2, pp. 210-11, RT of trial pp. 2253-54. Juliette LaBrecque followed Irene Harrod's commands because Irene maintained a higher ranking in their "religion." ER Vol. 2, p. 213, RT of trial, p. 2256.

14

Michael LaBrecque was not in the bedroom when the pornographic pictures were taken. At the end of the session, Irene Harrod opened the door and saw Mr. LaBrecque standing outside the door to the bedroom. ER Vol. 2, p. 182, RT of trial, p. 2009. Irene had already placed the photographs in any empty box, and she handed the box to Mr. LaBrecque and told him that Allen Harrod told her to give him the pictures. Mr. LaBrecque said nothing in response but accepted the box of pictures. ER Vol. 2, pp. 183-84, RT of trial, pp. 2010-2011. According to J. Harrod, Michael LaBrecque mentioned "have fun" to J. Harrod either before or after the photo session. ER Vol. 2, pp. 362, 369, RT of trial, p. 2449, 2514.

At the time she took the photos, Irene Hunt believed that J. Harrod was in her care–not the LaBrecques. ER Vol. 2, p. 185, RT of trial, p. 2012. After about four weeks, Irene Harrod returned home while J. Harrod remained with the LaBrecque family to continue his home-schooling. RT of trial, p. 2049.

## VI.  Summary of the Argument

The government charged defendants Allen Harrod and Michael LaBrecque with a number of counts involving sexual abuse of Mr. Harrod's then 7-year old son, J. Harrod, and four minor daughters of Michael and Juliette LaBrecque. Other than sentencing issues, this appeal challenges *only* the sufficiency of the evidence on counts one through three, all involving J. Harrod.

At trial, J. Harrod's mother Irene Harrod testified that, in 1991 when J. Harrod was seven years old, Irene and J. Harrod flew from their home in California to the home of Michael and Juliette LaBrecque in Texas so that J. Harrod could be home-schooled by Juliette LaBrecque. Irene Harrod had been in a special education program as a child and did not want her son to go through the same experience. Irene and her son spent a month together at the LaBrecques'

15

Texas home where J. Harrod was home-schooled by Juliette LaBrecque. A couple of weeks into their stay, Irene ordered J. Harrod and Juliette LaBrecque to go to a bedroom, disrobe, and assume sexually explicit poses together while Irene took photos. At the end of the month, Irene returned to California and left J. Harrod with the LaBrecques where he lived and continued to be schooled at home for several years.

Counts two and three charged violations of 18 U.S.C. § 2251A, which punishes the sale or transfer of a child for the purpose of producing child pornography. In count two, the government charged Mr. Harrod and his wife Irene under section 2251A(a) with being parents or guardians who transferred "custody and control" of their son J. Harrod with knowledge that, as a "consequence of the . . . transfer," the minor will be portrayed in a visual depiction of sexually explicit conduct with another person. Likewise, in count three, Mr. LaBrecque and his wife Juliette were charged under section 2251A(b) with obtaining the "custody and control" of J. Harrod from the Harrods "with knowledge that, as a consequence" of obtaining custody, the minor will be portrayed in a visual depiction of sexually explicit conduct.

The evidence at trial was insufficient to sustain the verdict on counts two or three. First, there was no evidence that the Harrods transferred "custody or control" of J. Harrod to Michael or Juliette LaBrecque when Irene Harrod took sexually explicit photos of her son at the LaBrecques' home. Rather, Irene Harrod exercised authority over her son (and Juliette LaBrecque) during the photo session and during their one-month stay together with the LaBrecques in Texas. Moreover, even if the Harrods had transferred custody of their son when the sexually explicit photos were taken, the photos were not taken "as a consequence

16

of" any transfer of custody. There was simply no causal connection between the transfer of any custody or control of the child and the production of pornographic photos.

With respect to count one, the evidence was also insufficient to convict *Mr. LaBrecque* of aiding and abetting the interstate travel of J. Harrod with the intent that he engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a). Although there was evidence that Mr. Harrod intended that J. Harrod engage in sexual activity when he went with his mother to stay with the LaBrecques in Texas in 1991, there was no evidence that Mr. LaBrecque intended that J. Harrod would be participating in sexual activity while in Texas. Rather, at most, the evidence showed that Mr. LaBrecque knew that the "religion" created by Mr. Harrod involved a "presentation" ritual involving sexual activity with minor girls. But no rational juror could find beyond a reasonable doubt that Mr. LaBrecque had reason to believe that their religion involved sexual activity with boys or that J. Harrod would be engaging in sexual activity while in Texas.

Further, the district court committed plain error in imposing a 15-year term of imprisonment on counts one and seven with respect to both Mr. Harrod and Mr. LaBrecque when the statutory maximum for the offenses charged in those counts was only ten years. The offenses charged in those two counts occurred before the maximum penalty for violations of 18 U.S.C. § 2423(a) had been increased from 10 to 15 years on October 30, 1998. Finally, the district court also erred in imposing a $25,000 fine on Mr. Harrod and Mr. LaBrecque in light of their indigence and financial obligations.

17

## VII.  Argument

###    A.  The Evidence Was Insufficient to Support Convictions for Counts Two and Three Because The Government Failed to Prove That at the Time Irene Harrod Took Sexually Explicit Pictures of J. Harrod, Allen Harrod Had Transferred Custody or Control of J. Harrod to, or That Michael LaBrecque Had Gained Custody or Control of, J. Harrod.

####        1.  Standard of Review

Both Mr. Harrod and Mr. LaBrecque moved for a judgment of acquittal after the close of all the evidence and again after the verdict.   Review is therefore *de novo*.  *United States v. Inunza*, 580 F.3d 894, 899 (9th Cir. 2009).   The question before the Court "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted).

####        2.  Mr. Harrod's Conviction for Count Two and Mr. LaBrecque's Conviction for Count Three Must Be Reversed Because the Evidence Showed That Irene Harrod Had Custody and Control of J. Harrod at the Time the Sexually Explicit Photographs Were Taken.

As described in more detail below, both Irene Harrod, who had pled guilty and was cooperating with the Government, and J. Harrod, a son of Irene and Allen Harrod, testified that in 1991, when J. Harrod was seven years old, his mother Irene flew with him from California to Texas.  Irene and J. Harrod spent a month together at the LaBrecque home in Texas, and during that time there was an occasion in which Irene ordered J. Harrod and Juliette LaBrecque to go into a bedroom at the LaBrecque home, disrobe, and assume sexually explicit poses together while Irene took pictures.  At the end of the month, Irene returned to California and left J. Harrod in Texas to live with the LaBrecques and be home-schooled by Juliette LaBrecque.

18

Irene Harrod's photo shoot of J. Harrod and Juliette LaBrecque was the basis for Counts Two and Three of the Second Superseding Indictment.  In Count Two,  Allen and Irene Harrod were jointly charged with violating 18 U.S.C. § 2251A(a)(1), which provides in relevant part as follows:

§ 2251A. Selling or buying of children

(a) Any parent, legal guardian, or other person having custody or control of a minor who sells or otherwise transfers custody or control of such minor, or offers to sell or otherwise transfer custody of such minor either–

(1) with knowledge that, as a consequence of the sale or transfer, the minor will be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct;

* * *

shall be punished by imprisonment for not less than 30 years or for life and by a fine under this title . . . .

Both Mr. LaBrecque and his wife Juliette LaBrecque were charged in Count Three with violating Section 2251A(b), which provides in relevant part:

(b) Whoever purchases or otherwise obtains custody or control of a minor, or offers to purchase or otherwise obtain custody or control of a minor either--

(1) with knowledge that, as a consequence of the purchase or obtaining of custody, the minor will be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct;

* * *

shall be punished by imprisonment for not less than 30 years or for life and by a fine under this title . . . .

One of the elements the Government must prove to sustain a conviction under either Sections 2251A(a) or 2251A(b) is that "custody or control" of a child is transferred from a parent or guardian to another person for the purpose of

19

making sexually explicit images.[5]  There is little law discussing the meaning of "custody or control" for purposes of Section 2251A.  In 18 U.S.C. § 2256(7), "custody or control" is defined to include "temporary supervision over or responsibility for a minor whether legally or illegally obtained."  In *United States v. Buculei*, 262 F.3d 322 (4th Cir. 2001), the Fourth Circuit observed:

> The word "control" is defined in the dictionary as the "power or authority to guide or manage." Webster's New International Dictionary 496 (3d ed.1993) (emphasis added). Likewise, "custody" is defined as the "act or duty of guarding and preserving." *Id*. at 559 (emphasis added).  The statutory definition likewise confirms that the minor must be under the defendants authority: "custody or control" includes "temporary supervision over or responsibility for a minor whether legally or illegally obtained." *Id*. § 2256(7).

*Buculei*, 262 F.3d at 334 (2001).

Defendants acknowledge that the transfer of "custody or control" of a child under Section 2251A could be as formal as legal transfer from a parent to another adult of permanent guardianship of a child, or as transitory as a parent having another person babysit their child for a few hours.  However, at a minimum, there must be some actual shift of authority over the child from the first parent/guardian to another person for the crime to occur.  The language of the statute makes this clear: subsection (a), of which Mr. Harrod was convicted, requires the defendant to "sell[] or otherwise transfer[] custody or control of such minor," and subsection (b), of which Mr. LaBrecque was convicted, requires the defendant to "purchase[] or otherwise obtain[] custody or control of a minor."

In this case, at the time that the sexually explicit photographs were taken, J. Harrod's mother Irene still had legal custody and actual control over her son.  In

---

[5]  The statute also criminalizes an "offer" to transfer custody or control of a child for these purposes, but the Government did not pursue this theory of guilt.

1991, the Harrods decided that their son, J. Harrod, should move to Texas to be home-schooled by Juliette LaBrecque. ER Vol. 2, pp. 1940-41, RT of trial, pp. 1968-69. A day or two before Irene Harrod left California for Texas with J. Harrod, Allen Harrod told her that while she was in Texas she should take pictures of J. Harrod and Juliette LaBrecque in sexual positions so that the Harrods would have something to blackmail Juliette with if she ever tried to leave the religion. ER Vol. 2, pp. 143, 202, RT of trial, pp. 1971, 2245.

After Irene and J. Harrod arrived in Texas, Irene and J. Harrod were given places to sleep in the LaBrecque home, and a routine began in which Juliette LaBrecque began home-schooling J. Harrod for a portion of every day. ER Vol. 2, pp. 163, 270-71, RT of trial, pp. 1991, 2313-14. During the month, Irene continued to "[take] charge" of J. Harrod, for example punishing him if he did something wrong and buying him clothes he needed. ER Vol. 2, pp. 274-75, 306 RT of trial pp. 2317-18, 2355. Irene understood that she could have taken J. Harrod back to California with her at any time if she wanted to. ER Vol. 2, p. 313, RT of trial, p. 2399. Juliette LaBrecque also understood this; on August 5, 1991, about a week after Irene and J. Harrod arrived in Texas, Juliette wrote in her journal that she and Irene planned to do a test to see if Juliette could run the home-school and take care of the house by herself, and if she could not "[Irene] would take J[.] with her to California." ER Vol. 3, p. 374, Government Exhibit 54(n)(5).

Two weeks after their arrival in Texas, Allen Harrod called Irene Harrod and told her to take the sexually explicit photographs. ER Vol. 2, p. 220, RT of trial, p. 2263. On the day the photographs were taken, Irene Harrod regarded J. Harrod as being in her care, not in the care of either of the LaBrecques. ER Vol. 2, p. 185, RT of trial, p. 2012. Irene testified that she, Michael LaBrecque, and

21

Juliette LaBrecque were all sitting in the living room, and J. Harrod was playing inside the home. ER Vol. 2, p. 169, RT of trial, p. 1997. Irene, who had not previously told the LaBrecques anything about Allen Harrod's order that Irene take sexually explicit photographs of Juliette and J., told Juliette that "we needed to go upstairs." ER Vol. 2, pp. 170, 201, RT of trial p. 1998:22-2, 2244. Irene also told her son J. "that we were going upstairs." ER Vol. 2, p. 171, RT of trial p. 1999:18. Irene did not explain why the three of them had to go upstairs, but Juliette and J. complied while Michael LaBrecque continued watching television in the living room. ER Vol. 2, p. 171, RT of trial p. 1999. J. Harrod obeyed Irene Harrod's command because she was his mother. ER Vol. 2, pp. 210-11, RT of trial pp. 2253-54. Juliette LaBrecque complied because Irene Harrod had higher rank than Juliette within the families' "religion" and had to obey Irene's commands. ER Vol. 2, p. 213, RT of trial p. 2256.

When Irene, Juliette, and J. reached the upstairs, Irene told Juliette and J. that they had to go into the bedroom. ER Vol. 2, p. 171, RT of trial p. 1999. Once they entered the bedroom, Irene told Juliette that "I needed to take some pictures of the three positions." ER Vol. 2, p. 172, RT of trial p. 2000:9-10. Irene did not explain why she needed to take the pictures, but told both Juliette and J. "they needed to undress and then get into each of the positions." ER Vol. 2, p. 173, RT of trial p. 2001:12-13. Juliette and J. got undressed as ordered. As Irene described at trial, the following photography session then took place in which Irene acted as director and photographer while Juliette and J. mutely followed her orders:

> [IRENE HARROD]: I asked them to -- I asked J[.] to lay down on the bed and then have [Juliette] lay on the bed with her mouth positioned over his penis.
>
> Q.    And did he lay on the bed?

22

A.    Yes, he did.

Q.    On his back?

A.    On his back.

Q.    And what did Juliette LaBrecque do?

A.    She got on the bed, and she -- she was just over with her head over the top.

Q.    Of his penis?

A.    Yes.

Q.    Was he erect?

A.    Yes.

Q.    Did you take a photograph?

A.    Yes, I did.

Q.    What happened then?

A.    I told him to get into the next position.

Q.    And what was the next position?

A.    That would be vaginal where she would -- she would lay on the bed, and then he would -- he would be on top of her and then having his penis toward her vagina.

Q.    Okay. And did she do that?

A.    Yes.

Q.    Did she say anything?

A.    No.

Q.    Did J[.] do that?

A.    Yes.

Q.    Was he still erect at the time?

A.    Yes, he was.

Q.    Did you take a photograph?

A.    Yes.

Q.    What happened then?

A.    I told him to get into the last position, and that would be doggy style.

Q.    What's doggy style?

A.    That's where the female's on all fours and then [J.] in the back with his penis pointed to the rectum.

Q.    And his penis was still erect at the time?

A.    Yes.

Q.    Did she do that?

A.    Yes, she did.

Q.    She got on all fours?

A.    Yes.

* * *

Q.    During the time that you were doing the photographing, did [J.] say anything to you?

A.    No.

Q.    Did he speak at all?

A.    No.

Q.    Did Juliette say anything to you?

A.    No.

Q.    Did she speak at all?

A.    I don't recall.

Q.    And what was Juliette's demeanor during the time that you were doing the photography?

A.    Just compliant.

ER Vol. 2, pp. 174-81, RT of trial, pp. 2002-2008.  Irene testified that during the entire photo shoot she "thought [J.] was still in my care."  ER Vol. 2, p. 185, RT of

24

trial, p. 2012:13.

After the photographs were taken and Juliette and J. had gotten dressed, Irene opened the bedroom door. Michael LaBrecque was standing outside of the bedroom. ER Vol. 2, p. 182, RT of trial, p. 2009. Irene gave Mr. LaBrecque the polaroid film box in which she had placed the pictures and explained to him that Allen Harrod had told her to give the pictures to him. ER Vol. 2, p. 183, RT of trial, p. 2010.

It is abundantly clear that it was Irene Harrod who initiated and choreographed the entire illegal photography session and took the sexually explicit photographs. While the LaBrecques would ultimately raise and home-school J. after Irene Harrod returned to Sacramento, it is Irene Harrod exercised authority over not only her seven-year-old son J. Harrod but Juliette LaBrecque as well during the photography session.

In response to the overwhelming evidence that Irene Harrod had custody and control of J. Harrod during the photo shoot (and even directed the photo shoot herself), the Government may refer to the facts that Michael LaBrecque took J. Harrod to a karate class at some time during the month that Irene and J. Harrod lived together with the LaBrecques, and that Juliette LaBrecque had authority over J. Harrod as his home-school teacher during this month. Mr. Harrod and Mr. LaBrecque do not dispute these facts. But these facts in no way refute that Irene Harrod continued to exercise maternal control over J. Harrod during this month, and that certainly during the photo shoot she was in complete control of both her son J. Harrod and Juliette LaBrecque. Just as Section 2256(7) makes clear that temporary control of a child during the production of sexually explicit images would be adequate to establish "custody or control" under Section 2251A, the fact

25

that J. Harrod's mother Irene retained parental control over her son during the specific period of time in which the sexually explicit images were produced makes it impossible for Mr. Harrod or Mr. LaBrecque to have committed the offenses described in Section 2251A.

**B.    The Evidence Was Insufficient to Support Convictions for Counts Two and Three Because The Government Failed to Prove That Any Transfer of Custody or Control of J. Harrod from the Harrods to the LaBrecques Was Causally Related to the Production of Sexually Explicit Photographs of J. Harrod.**

### 1.    Standard of Review

For the reasons stated in Section VII(a)(1) of this brief, the standard of review on this issue is *de novo*.

**2.    Mr. Harrod's Conviction for Count Two and Mr. LaBrecque's Conviction for Count Three Must Be Reversed Because There Was No Evidence that Sexually Explicit Photographs Were Taken of J. Harrod "As a Consequence" of Any Transfer of Custody.**

As set forth above, Defendants maintain that at the time the sexually explicit photographs of J. Harrod were taken, custody or control of J. Harrod had not been transferred from the Harrods to the LaBrecques. However, even if there was sufficient evidence to find that custody or control of J. Harrod had been transferred, there was absolutely no evidence that such a transfer was causally related to Irene Harrod's act of ordering her son J. and Juliette LaBrecque to pose for sexually explicit photographs. Instead, the evidence was that Irene Harrod used the authority she retained as J. Harrod's mother to order him to participate in a pornographic photo shoot that she initiated and executed herself.

18 U.S.C. § 2251A(a)(1) requires that the defendant have "knowledge that, *as a consequence of* the sale or transfer, the minor will be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit

26

conduct" (emphasis added). Similarly, 18 U.S.C. § 2251A(b)(1) requires that the defendant have "knowledge that, *as a consequence of* the purchase or obtaining of custody, the minor will be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct." § 2251A(b)(1) (emphasis added).[6] The plain meaning of the phrase "as a consequence of" requires that there be a causal connection between the sale or transfer of custody or control and creation of the sexually explicit image. "Consequence" means "something that is produced by a cause or follows from a form of necessary connection or from a set of conditions: a natural or necessary result." Webster's Third New International Dictionary 483 (1981). *See also*, *e.g.*, *CNG Transmission Mgmt. VEBA v. United States*, 588 F.3d 1376, 1379 (Fed. Cir. 2009) (discussing fact that phrases "results in," "causes," and "as a consequence of" all have similar meanings, *i.e.* "caused by.") Under the statute, the transfer of custody or control cannot just coincide with the production of child pornography; the production of child pornography must be causally linked to the transfer of custody or control.

The fact that the transfer of custody or control must be causally linked to the creation of sexually explicit images is not surprising given the legislative history of Section 2251A of Title 18. The statute was enacted in 1988 as part of the Child

---

[6]     18 U.S.C. § 2251A also contains subsections punishing persons who transfer or accept custody or control of a child "with intent to promote" sexually explicit conduct by a minor that will lead to the production of child pornography. 18 U.S.C. § 2251A(a)(2) and (b)(2). The government did not charge this conduct in the second superseding indictment, but instead alleged that both Allen Harrod and Michael LaBrecque acted "with the knowledge that as a consequence of" the transfer of custody or control of J. Harrod, J. Harrod "would be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct." See ER Vol. 2, pp. 75-76, CR 47, pp. 2-3.

Protection and Obscenity Enforcement Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 (codified at 18 U.S.C. § 2251A). As this Court has observed, the Act was aimed at combating child pornography:

> The continuing effort to marshal a means of stopping child pornography resulted in the passage of the Child Protection and Obscenity Enforcement Act of 1988. See Pub.L. No. 100-690, 102 Stat. 4181 (1988) (codified as amended at 18 U.S.C. §§ 2251A-2252). This law made it unlawful to use a computer to transport, distribute, or receive child pornography. See *id.* § 7511. It also added a new section to the criminal law that prohibited the buying, selling, or otherwise obtaining of temporary custody or control of children *for the purpose of producing child pornography.* See *id.* § 7512. The new law required record keeping and imposed disclosure requirements on the producers of certain sexually explicit matter. See *id.* § 7513.

*Free Speech Coalition v. Reno*, 198 F.3d 1083, 1088 (9th Cir. 1999), *aff'd sub nom. Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (emphasis added).

Section 7512 of the Act, which was codified as 18 U.S.C. § 2251A, is entitled "Selling or Buying Children" and includes the title "Selling or Buying of Children" in Section 2251A itself. When Senator Thurmond spoke in favor of the the new provision, he noted that it "is based in part on the recommendations of the Attorney General's Commission on Pornography," and "prohibit[s] the buying and selling of children for use in child pornography." 134 Cong. Rec. S13326-01, 1988 WL 176238, at * 2. Similarly, Senator Byrd also urged passage of the bill, stating, "[i]ncredibly, current law does not prohibit a parent from selling his child's services for use in pornographic materials." 134 Cong. Rec. S13418-04, 1988 WL 176516. Senator Biden observed that the bill "prohibits the buying and selling of children for the purpose of producing child pornography." *Id.* Thus, the harm the statute seeks to address is buying, selling, and transfer of custody or control of children *for the purpose of producing child pornography.*

In this case, the behavior of the Harrods and LaBrecques toward J. Harrod,

28

while abominable, simply did not fall within Section 2251A.  While responsibility for raising and educating J. Harrod was eventually transferred from Allen and Irene Harrod to Michael and Juliette LaBrecque, regardless of what point in time the transfer took place, the transfer was never part of a causal chain that led to the production of pornographic images of J. Harrod.  Instead, Irene Harrod, J. Harrod's mother, took the pornographic pictures herself while she was still in Texas, and she used the authority she retained as J.'s mother to command J. to participate in the photo shoot.  The photo shoot had to take place before Irene Harrod returned to California because Irene, and not either of the LaBrecques, was the one Allen Harrod directed to take the pornographic pictures.  While Irene had to be in the same vicinity as Juliette LaBrecque to take the pictures because Allen Harrod wanted Juliette included in the images so that she could later be blackmailed, there was no need for Juliette or Michael LaBrecque to have custody or control of J. Harrod for the pictures to be taken.  Put another way, Allen and Irene Harrod did not give the LaBrecques custody or control of their child with knowledge that doing so would cause pornographic images of the child to be created; rather, Irene Harrod herself staged and produced the child pornography while staying in the LaBrecque home, and she used *her* authority, not any authority the LaBrecques may have gained over J., to force J. to participate.

While Defendants maintain that the language "as a consequence of" in 28 U.S.C. § 2251A clearly requires a causal connection between the transfer of custody or control of the child and the production of child pornography, any doubt on this point must be resolved in favor of Harrod and LaBrecque.  The "rule of lenity" requires that penal statutes be strictly construed against the government and in favor of a criminal defendant.  *United States v. Harrell*, 530 F.3d 1051,

29

1058 n. 3 (9th Cir. 2008). When "text, structure, and history fail to establish that the Government's position is *unambiguously* correct-we . . . resolve the ambiguity in [the defendant]'s favor." *United States v. Cabaccang*, 332 F.3d 622, 634 (9th Cir. 2003) (*en banc*) (emphasis in original) (quoting *United States v. Granderson*, 511 U.S. 39, 54 (1994)). Thus, even if this Court were to determine that it is not clear that the statute requires the transfer of custody or control to be part of a chain of causation that leads to the production of child pornography, because inclusion of the phrase "as a consequence of" makes this at the very least ambiguous, the statute must be interpreted in favor of Mr. Harrod and Mr. LaBrecque. Since there was no evidence that Allen Harrod or Michael LaBrecque transferred custody or control of J. Harrod from the Harrods to the LaBrecques with knowledge that the transfer would be causally linked to the production of child pornography, the evidence, even taken in the light most favorable to the government, cannot support the convictions for Counts Two and Three.

**C. The Evidence Was Insufficient to Support Conviction of Michael LaBrecque on Count One Because There Was No Evidence That Michael LaBrecque Acted with the Intent That J. Harrod Engage in Illegal Sexual Conduct.**

**1. Standard of Review**

For the reasons stated in Section VII(A)(1) of this brief, the standard of review on this issue is *de novo*.

**2. Mr. LaBrecque's Conviction for Count One Must Be Reversed Because There Was No Evidence That He Assisted in Arranging for J. Harrod's 1991 Trip from California to Texas with the Intent that J. Harrod Participate in Illegal Sexual Conduct While in Texas.**

Count One charged that between July 1, 1991, and September 1, 1991, Allen Harrod, Michael LaBrecque, and Juliette LaBrecque aided and abetted the interstate travel of J. Harrod with the intent that he engage in criminal sexual

30

activity, in violation of 18 U.S.C. § 2423(a).  Allen Harrod and Michael LaBrecque were convicted of this count, while the jury hung as to Juliette LaBrecque.  Mr. LaBrecque submits that the evidence, taken in the light most favorable to the government, cannot support a finding that he had the required *mens rea* for this offense.

In order to prove that a person is guilty of Section 2423(a), the prosecution must not only prove that they aided and abetted the interstate transportation of a minor, but also that he did so with the intent that the minor engage in criminal sexual activity.  The statute provides in relevant part that:

> (a) Transportation with intent to engage in criminal sexual activity.--A person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, *with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense*, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2423(a) (emphasis added).  As this Court has observed, "[i]ntent is plainly an element of transporting a minor with intent to engage in criminal sexual activity under 18 U.S.C. § 2423(a)." *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir. 1997).  The defendant must have both the intent to transport the minor and the intent that the minor engage in criminal sexual activity. *Id.*  The government bears the burden of proving that the defendant had the requisite intent, *United States v. Vik*, 655 F.2d 878, 881 (8th Cir. 2001), and that the defendant formed this intent by the time the interstate travel was complete. *United States v. Cole*, 262 F.3d 704, 708-09 (8th Cir. 2001) .

There was simply no evidence that prior to or during J. Harrod's 1991 trip from California to Texas, Michael LaBrecque had any idea that J. Harrod would be participating in criminal sexual activity while he was in Texas.  According to

31

the evidence, by the time J. Harrod traveled from California to Texas in 1991, Mr. LaBrecque knew that the religion Mr. Harrod created and Mr. LaBrecque was attempting to follow did involve extramarital sexual activity between adults.[7]   In addition, taken in the light most favorable to the government, there was evidence to show that by the time of J. Harrod's 1991 interstate travel, Mr. LaBrecque knew about "the presentation" ritual and understood that it involved sexual activity with underage girls.[8]   The evidence, again taken in the light most favorable to the

---

[7]     According to Irene Harrod, at some point in the 1980s while the LaBrecques were still living in California, Allen Harrod, Irene Harrod, Michael LaBrecque, and Juliette LaBrecque went through two rituals known as "indications." In the first "indication," Irene and Allen Harrod went to the LaBreques home on Mather Air Force Base, and Allen Harrod watched Michael and Juliette LaBrecque have sexual intercourse. ER Vol. 2, p. 117, RT of trial, p. 1945. In the second indication, Juliette LaBrecque went through some sort of sexual ritual at the Harrod's home. *Id*. Neither of the "indications" involved children. *Id*.

[8]     The religion created by Allen Harrod included a practice or ritual called the "presentation." Irene Harrod first learned about the "presentation" in 1983. ER Vol. 2, p. 110, RT of trial, p. 1938. Only girls went through the "presentation." ER Vol. 2, p. 113, RT of trial, p. 1941. According to Allen Harrod's teaching, a girl was supposed to be "prepared" for her "presentation" starting at age eight and continuing until she was approximately 12 years old, as the date of the "presentation" was tied to the date the girl began menstruating. ER Vol. 2, p. 111-13, 115, RT of trial, pp. 1939-1941, 1943. The training involved learning how to engage in oral sex. ER Vol. 2, p. 112, RT of trial, p. 1940. By early 1991, Allen Harrod told Michael LaBrecque about the "presentation." ER Vol. 2, p. 113-14, 119, 135-36, RT of trial, pp. 1941-42, 1947, 1963-64. A great deal of evidence at trial established that all of "the presentations" carried out by the Harrod and LaBrecque families involved a LaBrecque daughter going to California and engaging in a number of sexual acts with Allen Harrod. The parties disputed when Mr. LaBrecque actually understood the sexual nature of "the presentation," but taken in the light most favorable to the government the evidence could support a finding that he knew about this by the time J. Harrod traveled to

government, could also support a finding that prior to J. Harrod's 1991 trip to Texas, Michael LaBrecque was already having some sexual contact with his underage daughters.[9]

However, there is no evidence to support a rational inference, as opposed to mere speculation, that before or during J. Harrod's 1991 trip from California to Texas, Mr. LaBrecque knew that J. Harrod would be involved in criminal sexual activity in Texas. Mr. LaBrecque had no reason to believe that the religion involved sexual activity with boys, and he had no reason to believe that J. Harrod would be engaging in sexual activity while in Texas. The evidence showed that the reason for J. Harrod's trip to Texas was to set him up to be home-schooled in Texas by Juliette LaBrecque.[10] The testimony indicated that Allen and Irene Harrod also planned to have Irene take sexually explicit pictures of J. Harrod and Juliette LaBrecque after they arrived in Texas, but there was no evidence that

---

Texas.

[9] Michael LaBrecque's journal entries for May 25, 1991, and July 14, 1991, both dates that occurred before Irene Harrod and J. Harrod arrived in Texas, indicates that on both of those days he masturbated in the shower "with a little help from" his five-year-old daughter K. ER Vol. 2 pp. 189-191, RT of trial, pp. 2044-46.

[10] In 1991, the Harrods decided that their son, J. Harrod, should move to Texas to be home-schooled by Juliette LaBrecque. ER Vol. 2, p. 140-41, RT of trial, pp. 1968-69. J. Harrod, who was seven years old in the summer of 1991, had just completed first grade, and his teacher said that he should be moved into a special education program. ER Vol. 2, p. 141, RT of trial, p. 1969. Irene Harrod had been in a special education program when she was a child and felt that as a result she had been branded as "basically dumb." She did not want J. Harrod to go through the same experience. ER Vol. 2, p. 142, RT of trial, p. 1970.

Michael LaBrecque knew of this plan before J. Harrod actually arrived in Texas.[11] Indeed, if Michael LaBrecque had been in on a plan to take compromising pictures of his wife that the Harrods could then use to blackmail her, there was no reason that Allen Harrod could not have simply told Michael LaBrecque to take the pictures with a child who was already living in Texas.

Whatever Michael LaBrecque may have learned about the plan after J. Harrod arrived in Texas is irrelevant to his intent for purposes of Count One; there was no evidence to support a finding that he knew about plans for J. Harrod to engage in sexual activity before or during his trip from California to Texas, and thus there was not sufficient evidence to support the conviction.

> **D.    The District Court Erred In Sentencing Mr. Harrod and Mr. LaBrecque to 15 Years Imprisonment On Counts One And Seven When The Statutory Maximum For Those Counts Was Only 10 Years Imprisonment.**

The district court committed plain error in imposing a 15-year sentence of imprisonment on counts one and seven for Mr. Harrod and Mr. LaBrecque when the statutory maximum for those two offense was only 10 years at the time of those offenses. Although no objection was made, this error requires relief under plain error review. *See United States v. Rodriguez-Lara*, 421 F.3d 932, 948-49 (9th Cir. 2005) (plain error is "(1) error, (2) that is plain, and (3) that affects

---

[11]    A day or two before Irene Harrod left California for Texas with J. Harrod, Allen Harrod told her that while she was in Texas she should take pictures of J. Harrod and Juliette LaBrecque in sexual positions. ER Vol. 2, p. 143, 202, RT of trial, p. 1971, 2245. Allen Harrod told Irene Harrod that he wanted the pictures for "reassurance," so that if Juliette LaBrecque "ever left the church and told authorities, he would have something to hold on her." ER Vol. 2, p. 143, RT of trial, p. 1971:16-17. There was no evidence that Allen or Irene Harrod communicated this plan to either Michael or Juliette LaBrecque.

substantial rights" and "seriously affects the fairness, integrity, or public reputation of judicial proceedings"). Counts one and seven charge violations of 18 U.S.C. § 2423(a) against both Mr. Harrod and Mr. LaBrecque. The maximum penalty for a violation of this statute was increased from 10 years to 15 years on October 30, 1998. *See* Protection of Children from Sexual Predators Act of 1998, Pub. L. No. 105-314, Title I, § 103, 112 Stat. 2976 (codified at 18 U.S.C. § 2423(a)). Count one charges an offense occurring between July 1, 1991 and September 1, 1991 while count seven charges an offense between July 1, 1998 and August 6, 1998, ER 76-77, 82-83. Thus, the maximum penalty for these two offenses is 10 years imprisonment and any sentence above this maximum would violate the *Ex Post Facto* Clause of the Constitution. *See Cummings v. Missouri*, 4 Wall. 277, 325-26 (1867) (The *ex post facto* prohibition--as set forth in Article I, § 9, cl.3 of the Constitution--forbids Congress from enacting any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.") . A sentence above the statutory maximum is a plain error that requires the sentence on these counts to be vacated and remanded for the district court to re-impose a sentence of not more than 10 years on each of counts one and seven with respect to both Mr. Harrod and Mr. LaBrecque.

### E. The Court Erred in Imposing $25,000 Fines on Both Mr. Harrod and Mr. LaBrecque.

#### 1. Standard of Review

The district court's determination that a defendant has the ability to pay a fine is a finding of fact reviewed for clear error. *See United States v. Rearden*, 349 F.3d 608, 617 (9th Cir. 2003).

### 2. In Light of Mr. Harrod's and Mr. LaBrecque's Indigence and Competing Financial Obligations, the District Court Clearly Erred in Imposing $25,000 Fines.

18 U.S.C. § 3571 provides that a district court "may" impose a fine. 18 U.S.C. § 3752 then sets forth the factors that the district court "shall" consider in addition to factors listed in 18 U.S.C. § 3553 in deciding whether to impose a fine and determining the amount:

> (1) the defendant's income, earning capacity, and financial resources;
>
> (2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;
>
> (3) any pecuniary loss inflicted upon others as a result of the offense;
>
> (4) whether restitution is ordered or made and the amount of such restitution;
>
> (5) the need to deprive the defendant of illegally obtained gains from the offense;
>
> (6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence.

18 U.S.C. § 3572(a). In addition, Section 3572(b) provides that:

> If, as a result of a conviction, the defendant has the obligation to make restitution to a victim of the offense, other than the United States, the court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution.

The applicable advisory guideline, U.S.S.G.§ 5E1.2, provides that, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). Application Note 3 to the guideline makes clear that "the fact that a defendant is represented by (or was determined eligible for) assigned counsel are significant indicators of present inability to pay any fine." The guideline also

provides that if the court is going to impose a fine, it must consider various factors in setting the fine, including, but not limited to, the defendant's ability to pay (§ 5E1.2(d)(2)), the burden the fine places on the defendant and his dependents (§ 5E1.2(d)(3)), any restitution or reparation that the defendant has made or is obligated to make (§ 5E1.2(d)(4)), and whether the defendant previously has been fined for a similar offense (§ 5E1.2(d)(6)).

In a decision issued last year, this Court clarified that:

> The district court must consult the Guidelines' recommendation, the § 3553(a) factors, and the 18 U.S.C. § 3572(a) factors to determine the appropriateness of the imposition of a fine and its amount. *See United States v. Eureka Labs., Inc.*, 103 F.3d 908, 913-14 (9th Cir.1996). "[T]he district court must explain [its decision] sufficiently to permit meaningful appellate review." *United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (*en banc*). We review for reasonableness, *see id.* at 994, the district court's decision to impose the fine and the determination of the amount. *See, e.g., United States v. LaGrou Distrib. Sys., Inc.*, 466 F.3d 585, 594 (7th Cir. 2006).

*United States v. Orlando*, 553 F.3d 1235, 1239 (9th Cir. 2009).

In the present case, the factors set forth in 18 U.S.C. § 3572 and U.S.S.G. § 5E1.2 were basically ignored; the court certainly did not discuss the factors, and it appears they were never even considered. For example, at the time of the federal sentencing, both Mr. Harrod and Mr. LaBrecque had already been convicted in state court for offenses arising out of the same conduct as the federal charges. Various provisions make clear that the district court should have considered all restitution and fines ordered in the state cases before imposing a federal fine (18 U.S.C. § 3572(a)(4) and U.S.S.G. § 5E1.2(d)(4) and § 5E1.2(d)(6)), and yet this factor was not even discussed by the district court.

The applicable statute and Guideline also provide that the court should have considered the burden the fine would place on the defendant *and his dependents*. *See* 18 U.S.C. § 3572(a)(2); U.S.S.G. § 5E1.2(d)(3); *see also United States v.*

37

*Sager*, 227 F.3d 1138, 1148-49 (9th Cir. 2000), *cert. denied*, 531 U.S. 1095 (2001) (district court clearly erred in failing to consider impact of fine on defendant's dependents). The interests of the dependents in this case were especially important given that many of them were victims of the offenses. In their CJA Form 23 financial affidavits, both Mr. Harrod and Mr. LaBrecque had noted they had many dependents. ER Vol. 3, pp. 371-72. In his formal objections to the advisory PSR, Mr. Harrod advised the court that he had informed the probation officer of his financial condition, *i.e.* that he had no assets except for a military pension that was barely sufficient to meet his child support obligations. ER Vol. 3, p. 376, CR 276. The court completely ignored this in deciding to set a fine and determining the fine amount.

The only basis the district judge gave for his decision to impose a fine was that Mr. Harrod and Mr. LaBrecque had not submitted information regarding their finances directly to the probation officer who prepared the advisory presentence investigation reports. The court ignored the fact that both defendants had submitted CJA Form 23 financial affidavits to the court and had, in the *court's* view, qualified for appointment of counsel. The district judge discounted the significance of the fact that counsel had been appointed, suggesting that the Federal Defender's office could and would agree to represent anyone who asked. ER Vol. 1, pp. 70-71, RT, 4/20/09, pp. 71-72. In fact, the CJA Form 23 affidavits submitted by Mr. Harrod and Mr. LaBrecque were sworn affidavits submitted to the court, and it was the court that determined they were eligible for counsel. Moreover, contrary to the district judge's light dismissal of the fact that the defendants qualified for court-appointed counsel, U.S.S.G. § 5E1.2 Application Note 3 states that:

38

[T]he fact that a defendant is represented by (or was determined eligible for) assigned counsel are significant indicators of present inability to pay any fine. In conjunction with other factors, they may also indicate that the defendant is not likely to become able to pay any fine.

In addition, there was no dispute that both Mr. Harrod and Mr. LaBrecque had been incarcerated at the Sacramento County Jail for over five years by the time they were sentenced, and that they both had been given state sentences, and were just about to receive federal sentences, that would ensure their incarceration for the remainder of their lifetimes. The financial information that Mr. Harrod and Mr. LaBrecque had submitted to the court, along with the undisputed facts before the court, was adequate to fulfill their burdens to establish that they could not pay a fine. The district court thus not only failed to follow proper procedures in imposing the fines, the fines themselves were unreasonable.

Although the typical remedy for a sentencing error is a remand to the district court for new sentencing proceedings, in light of the ample evidence that Mr. Harrod and Mr. LaBrecque cannot pay $25,000 fines, in this case this Court should simply order the district court to strike the fines without further proceedings.

## VIII. Conclusion

For these reasons, the Court must vacate Mr. Harrod's conviction on count 2 and Mr. LaBrecque's convictions on counts 1 and 3 of the Superseding Indictment and remand for entry of a judgment of acquittal on those counts. The Court must also vacate the sentence on counts one and seven and remand for re-imposition of a sentence on those counts of not more than 10 years imprisonment. Finally, the Court must also order the district court to strike the $25,000 fine from the

sentences of both Mr. Harrod and Mr. LaBrecque.


Dated: March 26, 2010

Respectfully submitted,


*/s/ John Balazs*
JOHN BALAZS

Attorney for Defendant-Appellant
ALLAN HARROD


DANIEL J. BRODERICK
Federal Defender


*/s/ Carolyn M. Wiggin*
CAROLYN M. WIGGIN
Assistant Federal Defender

Attorney for Defendant-Appellant
MICHAEL LABRECQUE

40

Nos. 09-10172 and 09-10179

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. Cr. 2:03-cr-00384-WBS |
| Plaintiff-Appellee, | ) | |
| | ) | STATEMENT OF RELATED CASES |
| v. | ) | |
| ALLEN HARROD, | ) | |
| MICHAEL LABRECQUE, | ) | |
| Defendants-Appellants. | ) | |

Defendants-Appellants are not aware of any related cases.

Dated: March 26, 2010

Respectfully submitted,


*/s/ John Balazs*
JOHN BALAZS

Attorney for Defendant-Appellant
ALLAN HARROD


DANIEL J. BRODERICK
Federal Defender


*/s/ Carolyn M. Wiggin*
CAROLYN M. WIGGIN
Assistant Federal Defender

Attorney for Defendant-Appellant
MICHAEL LABRECQUE

Nos. 09-10172 and 09-10179

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. Cr. 2:03-cr-00384-WBS |
| Plaintiff-Appellee, | ) |
| v. | ) CERTIFICATE OF COMPLIANCE |
| ALLEN HARROD, and | ) |
| MICHAEL LABRECQUE, | ) |
| Defendants-Appellants. | ) |

     Defendants-Appellants certify that this brief is proportionately spaced, has a typeface of 14 points,  and contains 12,181 words.

Dated: March 26, 2010

                   Respectfully submitted,


                   */s/ John Balazs*
                   JOHN BALAZS

                   Attorney for Defendant-Appellant
                   ALLAN HARROD


                   DANIEL J. BRODERICK
                   Federal Defender


                   */s/ Carolyn M. Wiggin*
                   CAROLYN M. WIGGIN
                   Assistant Federal Defender

                   Attorney for Defendant-Appellant
                   MICHAEL LABRECQUE

Nos. 09-10172 and 09-10179

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. Cr. 2:03-cr-00384-WBS |
| Plaintiff-Appellee, | ) | |
| | ) | CERTIFICATE OF SERVICE |
| v. | ) | |
| ALLEN HARROD, and MICHAEL LABRECQUE, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

I hereby certify that on March 26, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 26, 2010

*/s/ Becky Darwazeh*
Becky Darwazeh