C.A. NOS. 09-10172, 09-10179

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,      )
                                ) C.A. Nos. 09-10172
        Plaintiff-Appellee,    )         09-10179
                                )
    v.                            )
                                ) D.C. No. 2:03-cr-384 WBS
ALLEN HARROD and         ) (E.D. Calif., Sacramento)
MICHAEL LABRECQUE,     )
                                )
        Defendant-Appellants.  )
_____ )

_____
Appeal from the United States District Court
for the Eastern District of California

BRIEF FOR APPELLEE

BENJAMIN B. WAGNER
United States Attorney

LAUREL D. WHITE
ELLEN V. ENDRIZZI
Assistant U.S. Attorneys

501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700

Attorneys for Appellee
UNITED STATES OF AMERICA

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . iv

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . 2

    1.   Nature of the Case, Course of Proceedings, and
       Disposition of the Case in District Court . . . . 2

    2.   Bail Status . . . . . . . . . . . . . . . . . . 6

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . 7

    Offense Conduct . . . . . . . . . . . . . . . . . . . 7

    The Girls . . . . . . . . . . . . . . . . . . . . . 10

    The Boy . . . . . . . . . . . . . . . . . . . . . . 12

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 23
    I.   Harrod's and Labrecque's Convictions for Counts Two
       and Three Must Be Affirmed Where there Was Sufficient
       Evidence From Which Jurors Could Conclude The Taking
       of Sexually Explicit Photographs of J. Was Causally
       Related to the Transfer of Harrod's Transfer of
       Custody or Control of J. To Labrecque . . . . . . 23

         A.   Standard of Review . . . . . . . . . . . 23

         B.   Defendants Were Properly Charged Under
            18 U.S.C. § 2251A . . . . . . . . . . . 25

         C.   Where There Was Sufficient Evidence Demonstrating
            Harrod Transferred Custody or Control of 7-Year
            Old J. To Labrecque With Knowledge That One
            Consequence was that J. Would Be Portrayed in
            Sexually Explicit Images, Defendant's Convictions
            For Counts Two and Three Must be Affirmed. . . 29

            1.   Harrod's Intent To Transfer Custody and
               Control . . . . . . . . . . . . . . . . 31

i

        2.    Labrecque's Assumption of Custody   . . .   33

        3.    Where There Was a Causal Relationship
               Between the Transfer of Custody and the
               Production of the Sexually Explicit Images,
               Defendant's Convictions Should be
               Affirmed . . . . . . . . . . . . . . . . . .   37

               Allen Harrod . . . . . . . . . . . . .   38

               Michael Labrecque   . . . . . . . . . .   39

II.   Sufficient Evidence Was Admitted From Which
      Jurors Could Conclude Labrecque Aided and Abetted
      the Interstate Travel of J. With The Intent Harrod's
      Son J. Engage in Unlawful Sexual Conduct . . . . . . 41

      A.   Standard of Review   . . . . . . . . . . . . .   41

      B.   Where There Was Sufficient Evidence Showing
           Labrecque Knew J. Harrod Would be Required to
           Engage in Unlawful Sexual Conduct Prior to J.'s
           Travel to Texas, Labrecque's Conviction for Count
           One Should be Affirmed . . . . . . . . . . . . .   43

III. Harrod and Labrecque Should Be Resentenced
      by the District Court as to Counts One and Seven
      Due to a Violation of the ex Post Facto Clause  . .  48

IV.  Where Defendant's Failed to Show They Lacked the
      Future Ability to Pay Fines The Imposition of Fines
      Was Not Error   . . . . . . . . . . . . . . . . . .   49

      A.   Standard of Review   . . . . . . . . . . . . .   49

      B.   The $25,000 Fines Were Not Unreasonable   . .   49

          1.    The PSRs and the Information
               Upon Which the District Court Relied  . .   51

          2.    The Defendants' Income, Earning Capacity,
               and Financial Resources   . . . . . . . .   52

               a.   Defendant Harrod   . . . . . . . .   52

               b.   Defendant Labrecque . . . . . . . .   54

3.   The Defendants Fail to Demonstrate a Fine
     Would Create a Burden for Dependents  . .  56

4.   There Was No Restitution Ordered in This
     Case  . . . . . . . . . . . . . . . . . .  58

5.   Expected Costs of Imprisonment  . . . . .  58

C.   The Defendants Failed to Demonstrate They Lacked
     The Future Ability to Pay the Imposed Fine  .  60

1.   The Defendants Can Participate in the
     Inmate Financial Responsibility Program   60

2.   Circuit Courts Have Affirmed Fines Imposed
     on Defendants Serving Life or Lengthy
     Sentences  . . . . . . . . . . . . . . .  62

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . .  62

STATEMENT OF RELATED CASES  . . . . . . . . . . . . . . . .  64

CERTIFICATE OF COMPLIANCE  . . . . . . . . . . . . . . . .  65

iii

TABLE OF AUTHORITIES

FEDERAL CASES

PAGE

Calder v. Bull,
   3 U.S. (3 Dall.) 386 (1798) ............................ 48

Carmell v. Texas,
   529 U.S. 513 (2000) ................................... 48

Jackson v. Virginia,
   443 U.S. 307 (1979) ............................... 24, 42

Montano-Figueroa v. Crabtree,
   162 F.3d 548 (9th Cir. 1998) ......................... 61

Rhoades v. Henry,
   596 F.3d 1170 (9th Cir. 2010) ........................ 49

Smith v. United States,
   508 U.S. 223 (1993) .................................. 27

Turf Center, Inc., v. United States,
   325 F.2d 793 (9th Cir. 1964) ......................... 47

United States v. Bauer,
   129 F.3d 962 (7th Cir. 1997) ......................... 62

United States v. Beltran-Garcia,
   179 F.3d 1200 (9th Cir. 1999) ........................ 46

United States v. Bonty,
   383 F.3d 575 (7th Cir. 2004) ......................... 45

United States v. Brady,
   579 F.2d 1121 (9th Cir. 1979) ................. 42, 43, 47

United States v. Buculei,
   262 F.3d 322 (4th Cir.2001) ....... 24, 26, 27, 28, 30, 31

United States v. Eureka Labs., Inc.,
   103 F.3d 908 (9th Cir. 1996) ......................... 50

iv

<u>United States v. Favorito</u>,
     5 F.3d 1338 (9th Cir. 1993) ......................... 50, 62

<u>United States v. Fox</u>,
     425 F.2d 996 (9th Cir. 1970) .......................... 45

<u>United States v. Frank</u>,
     599 F.3d 1221 (11th Cir. 2010) ................. 28, 30, 31

<u>United States v. Gianelli</u>,
     543 F.3d 1178 (9th Cir. 2008) ........................ 48

<u>United States v. Goode</u>,
     814 F.2d 1353 (9th Cir. 1987) ..................... 25, 42

<u>United States v. Haggard</u>,
     41 F.3d 1320 (9th Cir. 1994) ...................... 61, 62

<u>United States v. Hyppolite</u>,
     65 F.3d 1151 (4th Cir. 1995) .......................... 62

<u>United States v. Inunza</u>,
     580 F.3d 894 (9th Cir. 2009) ...................... 24, 42

<u>United States v. Iverson</u>,
     162 F.3d 1015 (9th Cir. 1998) ..................... 24, 28

<u>United States v. Jackson</u>,
     72 F.3d 1370 (9th Cir. 1995), <u>cert. denied</u>,
     116 S. Ct. 1546 (1996) ................................ 42

<u>United States v. Kinslow</u>,
     860 F.2d 963 (9th Cir. 1988) ......................... 45

<u>United States v. Knox</u>,
     32 F.3d 733 (3d Cir. 1994) ........................... 27

<u>United States v. Ladum</u>,
     141 F.3d 1328 (9th Cir. 1998) ..................... 50, 60

<u>United States v. Lord</u>,
     711 F.2d 887 (9th Cir. 1983) ......................... 46

<u>United States v. Nevils</u>,
     598 F.3d 1158 (9th Cir. 2010) ................. 24, 25, 42

v

United States v. Orlando,
    553 F.3d 1235 (9th Cir. 2009) .............. 49, 50, 58, 60

United States v. Ortland,
    109 F.3d 539 (9th Cir. 1997) ........................... 58

United States v. Quan-Guerra,
    929 F.2d 1425 (9th Cir. 1991) .......................... 61

United States v. Sager,
    227 F.3d 1138 (9th Cir. 2000) .......................... 57

United States v. Schubert,
    957 F.2d 694 (9th Cir. 1992) ........................... 50

United States v. Seale,
    20 F.3d 1279 (3d Cir. 1994) ............................ 62

United States v. Syrax,
    235 F.3d 422 (9th Cir. 2000) ........................... 49

United States v. Tapia-Romero,
    523 F.3d 1125 (9th Cir. 2008) .......................... 58

United States v. Tocco,
    135 F.3d 116 (2d Cir. 1998) ............................ 62

United States v. Vang,
    128 F.3d 1065 (7th Cir. 1997) .......................... 46

United States v. Yeje-Cabrera,
    430 F.3d 1 (1st Cir. 2005) ............................. 62

United States v. Zakhor,
    58 F.3d 464 (9th Cir. 1995) ............................ 59

FEDERAL STATUTES

18 U.S.C. § 2251A ................................... 1, 25, 30

18 U.S.C. § 2251A(a) ...................................... 21

18 U.S.C. § 2251A(a)(1) ................................. 4, 37

18 U.S.C. § 2251A(b) ...................................... 21

18 U.S.C. § 2251A(b)(1) .................................. 3, 37

18 U.S.C. § 2251A(b)(2) ...................................... 27

18 U.S.C. § 2256(7) .......................................... 30

18 U.S.C. § 2423(a) ................................. 1, 3, 48, 49

18 U.S.C. § 2423(b) ........................................... 4

18 U.S.C. § 3231 .............................................. 1

18 U.S.C. § 3553(a) .......................................... 50

18 U.S.C. § 3571(a) .......................................... 60

18 U.S.C. § 3572(a) ...................................... 50, 60

18 U.S.C. § 3572(a)(1) through (a)(8) ....................... 50

18 U.S.C. § 3572(a)(2) ....................................... 50

18 U.S.C. § 3572(a)(4) ....................................... 50

18 U.S.C. § 3572(a)(6) ................................... 50, 58

18 U.S.C. § 3572(b) .......................................... 58

18 U.S.C. § 3572(d) .......................................... 61

18 U.S.C. § 3742(a) ........................................... 2

28 U.S.C. § 1291 .............................................. 2

Fed. R. App. P. 4(c) .......................................... 2

Pub. L. No. 105-314, Title I, § 103, 112 Stat. 2976 ......... 49

<u>SENTENCING GUIDELINES</u>

U.S.S.G. § 5E1.2, Application Note 3 ........................ 54

U.S.S.G. § 5E1.2(a) ..................................... 49, 60

U.S.S.G. § 5E1.2(d) .......................................... 50

vii

U.S.S.G. § 5E1.2(d)(7) .................................... 58

U.S.S.G. § 5E1.2(i) ..................................... 59

BENJAMIN B. WAGNER
United States Attorney
LAUREL D. WHITE
ELLEN V. ENDRIZZI
Assistant U.S. Attorneys
501 I Street, Suite 10-100
Sacramento, California  95814
Telephone:  (916) 554-2700


IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT


| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) C.A. Nos. 09-10172 |
| Plaintiff-Appellee, | )          09-10179 |
| | ) |
| v. | ) |
| | ) D.C. No. 2:03-cr-384 WBS |
| ALLEN HARROD and | ) (E.D. Calif., Sacramento) |
| MICHAEL LABRECQUE, | ) |
| | ) |
| Defendant-Appellants. | ) |
| _____ | ) |

<u>JURISDICTION</u>

The defendants were charged with violating 18 U.S.C.

§§ 2251A, 2423(b), 2423(a), and 2. C.R. 47; E.R. 398, 74.[1]  The

district court, therefore, had jurisdiction pursuant to 18 U.S.C.

§ 3231.  Judgment for both defendants was orally pronounced on

April 20, 2009, and entered on the record on April 24, 2009.

C.R. 302, 303, 305, 306; E.R. 413, 377-386.  Defendant Labrecque

filed a timely notice of appeal on April 24, 2009.  C.R. 307;

_____

[1]All references to C.R. are in the Docket Sheet at E.R. 389-417.

1

E.R. 413, 387; Fed. R. App. P. 4(c). Defendant Harrod's notice of appeal was timely filed on April 28, 2009. C.R. 310; E.R. 413, 388; Fed. R. App. P. 4(c). This Court, therefore, has jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether there was sufficient evidence demonstrating Allen Harrod transferred custody/control of his son J. to Michael Labrecque with the intent J. be depicted in sexually explicit images.

2. Whether there was sufficient evidence demonstrating J. had been transferred to Michael Labrecque at the time sexually explicit images were taken of him.

3. Whether there was sufficient evidence to establish Michael Labrecque aided and abetted the interstate travel of J. with the knowledge J. would be made to engage in unlawful sexual activity.

4. Whether the district court erred in imposing 15 year sentences for each of Counts One and Seven where the statutory maximum was 10 years imprisonment.

5. Whether defendants made a sufficient factual showing each lacked the present and future ability to pay a fine.

## STATEMENT OF THE CASE

1. Nature of the Case, Course of Proceedings, and Disposition of the Case in District Court

On August 19, 2003, a criminal complaint was filed alleging Michael Labrecque and his wife Juliette transported and aided and abetted the transportation of three minors in interstate commerce

2

with the intent each minor engage in unlawful sexual conduct.
18 U.S.C. § 2423(a); C.R. 1.

On August 28, 2003, a grand jury returned a three-count
indictment charging both Labrecques with the same charges alleged
in the criminal complaint.  C.R. 3.

On February 12, 2004, a nine-count superceding indictment
was filed adding defendants Allen Harrod and his common-law wife
Irene Hunt[2] to the indictment.  C.R. 20.  The charges were
amended slightly in a second superceding indictment filed May 6,
2004.  C.R. 47; E.R. 74-81.  In that indictment Michael Labrecque
and Allen Harrod were charged with six counts of transporting
four minors (Victims 1,2,and 4) in interstate commerce with the
intent that each minor engage in unlawful sexual activity, and
aiding and abetting.  18 U.S.C. §§ 2423(a) and 2.

Michael Labrecque was also charged in Count Three with
obtaining custody or control of a minor (Victim 3) with knowledge
that as a consequence of the transfer of custody, the minor would
be portrayed in a visual depiction engaging in, or assisting
another person to engage in, sexually explicit conduct, and
aiding and abetting.  18 U.S.C. §§ 2251A(b)(1) and 2;  E.R. 76.
In Count Nine, Labrecque was charged with traveling in interstate

_____

[2]Irene Hunt pleaded guilty to Count Two charging her with
aiding and abetting the transfer of custody/control of a minor
under her care, with knowledge that as a consequence of that
transfer, the child will be depicted in sexually explicit images.
C.R. 95, 98; E.R. 194:21-195:7.  She cooperated with the
government and testified at trial.  E.R.195:6-7.

3

commerce for the purpose of engaging in sexual conduct with a minor (victim 5), and aiding and abetting. 18 U.S.C. §§ 2423(b) and 2. E.R. 79-80.

Allen Harrod was charged in Count Two with the transfer of custody or control of a minor to another, in interstate commerce, with knowledge that as a consequence of that transfer, the minor (Victim 3), would be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct, and aiding and abetting. 18 U.S.C. § 2251A(a)(1) and 2. C.R. 47; E.R. 75.

On May 21, 2004, Michael Labrecque and Allen Harrod were arraigned on the second superseding indictment. C.R. 57; E.R. 398.

On March 30, 2006, the court set the matter for jury trial to commence April 25, 2006. C.R. 106; E.R. 401. On April 14, 2006, defendants moved to waive jury trial. C.R. 118; E.R. 401. The government filed its response in opposition to waiver of jury trial on April 17, 2006. C.R. 120; E.R. 401. On April 19, 2006, the court granted defendants' motion to waive jury trial. C.R. 128; E.R. 402. On request by the government, the court stayed the matter, and vacated the trial date to permit the government to file a petition for writ of mandamus challenging the court's order granting defendants' motion to waiver jury trial. C.R. 128; E.R. 402.

4

On October 4, 2006, the Court of Appeals granted the
government's petition for a writ of mandamus, and the matter was
set for jury trial to commence June 12, 2007.  C.R.  146, 147,
160; E.R. 403, 404.  The jury trial was later continued to
provide the defense time to resolve its petition for certiorari
before the United States Supreme Court.  C.R. 155; E.R. 403.
Upon denial of defendant's certiorari petition, a jury trial date
was scheduled to begin January 2, 2007.  C.R. 161, 172; E.R. 404.

Following a 20-day trial, the jury returned guilty verdicts
against Allen Harrod as to Counts 1 and 2, 4, 5, 6, 7, and 8.
C.R. 233, 236; E.R. 409.  Guilty verdicts were returned against
Michael Labrecque as to Counts 1, 3, 4, 5, 6, 7, and 8.  The jury
hung on Count 9.  C.R. 233, 236; E.R. 409.[3]

The district court sentenced the defendants on September 13,
2008.  C.R. 302, 303; E.R. 413.  As to Michael Labrecque, the
court adopted the Probation Officer's calculations in the
Presentence Report and found that the defendant's offense level
was 45, and his criminal history category I.  C.R. 302; E.R. 413;
S.E.R. 722:6-11.  The court sentenced Labrecque to 180 months
imprisonment as to each of counts 1, and 4 through 8 to be served
consecutively, for a total term of 1,080 months, and a life term
of imprisonment as to Count 3, to be served concurrently to the

---

[3]The jury hung on Counts One and Three as against Juliette
Labrecque and those charges were dismissed. C.R. 248, 250.  Count
Nine was dismissed as against Michael Labrecque.  C.R. 267.

terms of imprisonment imposed for counts 1 and 4 through 8. C.R. 302; E.R. 413; S.E.R. 737:8-19. The court also imposed a $700 special assessment and $25,000 fine. S.E.R. 737:20-23. Judgment was entered on April 24, 2009. C.R. 306; E.R. 413. The defendant filed his timely notice of appeal April 24, 2009. C.R. 307; E.R. 413.

As to Harrod, the court adopted the Probation Officer's calculations in the Presentence Report and found the defendant's offense level was 43, and his criminal history category II. S.E.R. 722:3-6. The court sentenced Harrod to 180 months for each of counts 1, and 4 through 8, to be served consecutively for a total term of 1,080 months; and a life term of imprisonment as to Count 2, to be served concurrently to the terms of imprisonment imposed for counts 1, and 4 through 8. C.R. 303; E.R. 413; S.E.R. 736:3-10. The court also imposed a $700 special assessment and $25,000 fine. C.R. 303; E.R. 413; S.E.R. 736:18-21. Judgment was entered on April 24, 2009. C.R. 305; E.R. 413. The defendant filed his timely notice of appeal April 28, 2009. C.R. 310; E.R. 413.

### 2. Bail Status

Harrod is serving a life term of imprisonment in California state prison and his federal sentence will follow. Labrecque is serving his federal sentence to be followed by a California state life term of imprisonment.

<u>STATEMENT OF FACTS</u>

In their joint appeal, the defendants challenge the sufficiency of the evidence as to Counts One, Two, and Three, all of which involved Allen Harrod's son J.  Therefore, the defendants explain, they have limited their facts to only those relevant to J. and have included only the testimony of Irene Hunt and J. Harrod in their excerpt of record.  As the jury learned, this case involved a criminal conspiracy between Allen Harrod and Michael Labrecque to sexually abuse their children under the guise of a religion.  The scheme traversed a lengthy period of time, preceding J.'s 1991 travel to Texas.  Therefore, this Court must review evidence of other events to appreciate the vast record from which jurors concluded that Harrod and Labrecque had full knowledge of what was intended for young J. when he was transported to Texas in July, 1991, and the role Harrod and Labrecque had carved out for him as their future Patriarch.  This additional evidence supported the jury's conclusions Labrceque and Harrod were guilty of Counts 1 through 3.  Therefore, the government has included additional testimony in its Supplemental Excerpt of Record (S.E.R.), to support the jury's verdicts as to Counts 1, 2, and 3.

<u>Offense Conduct</u>

On October 4, 2001, Folsom police detective Robert Challoner executed a warrant to search Allen Harrod's residence in Folsom, California.  S.E.R. 6:10-7:10.  When Detective Challoner arrived

7

at Harrod's home he located four young girls living inside the house. S.E.R. 8:23-25. The girls were identified as: T. Labrecque (Victim 4), age 17, S. Labrecque (Victim 1), age 16, K. Labrecque (Victim 2), age 15 and D. Harrod, age 7. S.E.R. 10:1-14:11.

The search warrant also yielded numerous computer disks and binders that contained volumes of typed and hand-written documents. S.E.R. 16:9-25; 20:4-19; 21:3-24:20.

Nearly a month later, officers searched a Sacramento storage unit rented by Harrod. S.E.R. 25-36; 125:2-128:8. From this location, officers seized numerous journals written by Michael Labrecque. S.E.R. 25-36; 597-649. Labrecque and his wife Juliette were long-time friends of Harrod and lived in Fort Worth, Texas with their five daughters and one son. E.R. 87:11-91:22. A review of the binders seized from Harrod's home and storage unit showed writings by Harrod and Labrecque. S.E.R. 572-665. When the computer disks were analyzed, they too were found to contain Harrod's writings, and journals prepared by the Labrecques chronicling their daily activities in Texas. S.E.R. 70:22-24; 673:23-686:6. Labrecque's journals were in Harrod's possession because he was required to send them to Harrod every month. S.E.R. 69:7-70:21. The journals included accounts of sexual acts Labrecque engaged in with his wife and minor daughters. S.E.R. 71:4-5; 170:1-171:20; 597-649, 653-665. The

earliest of Labrecque's journals[4] were dated 1991.  S.E.R. 29:12-36:18; 597-635.  Labrecque, however, began to send Harrod his journals as early as 1983.[5]  S.E.R. 70:1-7.  This continued through 2001.  S.E.R. 70:1-21.

The journal entries and other writings evidenced the religious doctrines devised by Harrod in Sacramento, and followed by Labrecque in Texas.  E.R. 106:20-108:21; S.E.R. 37:12-41:6; 529:5-10; 572-665.  The two men imposed their beliefs on their wives and children who were compelled to participate in the sex practices the two men required.  E.R. 106:22-108:21; S.E.R. 527:8-528:4.  Allen Harrod was his family's patriarch in Sacramento, and Michael Labrecque was the patriarch of his family in Texas.  E.R. 107:24-25; S.E.R. 448:15-19; 606-607.[6]

The two men indoctrinated their children into this purported religion which had an overriding emphasis on sex.  S.E.R. 341:2-342:14; 385:15-20; 447:12-17; 526:22-527:24.  Harrod claimed the sex he forced the female children to engage in brought them

---

[4]In his journals Michael Labrecque, identified himself as "Joseph, Son of Isaac."  S.E.R. 597,603,626.

[5]Following their arrest in October 2001, Harrod and Hunt bailed out of jail.  They went to their storage unit prior to its search by police and retrieved numerous items, including some of Labrecques' journals which they destroyed.  S.E.R. 126:23-130:1. They overlooked, however, the plastic file box that contained the 1991-1992 journals.  S.E.R. 125:2-132:15; 597-635.

[6]In fact, when she was in Texas in August, 1991, Hunt taught the Labrecque girls a special greeting to honor their "Lord" or patriarch -- Michael Labrecque.  S.E.R. 88:6-90:9.

closer to God -- meaning him -- and placed them in his "circle of love" and in "oneness" with him.  S.E.R. 389:21-390:15; 387:1-9; 392:18-395:24; 402:13-403:11; 435:24-436:4.  Harrod devised a ritual called the "Presentation" to mark each girl's coming of age.  E.R. 110:4-115:9.  The "Presentation," which occurred when each girl's menstrual cycle began, was to prepare her to become an adult.  E.R. 110:4-115:9; S.E.R. 572-577.  The "Presentation" required each girl to engage in three sexual acts, to include oral copulation, vaginal intercourse, and anal intercourse with Allen Harrod.  E.R. 112:8-9; S.E.R. 481:9-494:9; 553:16-20; 572-577.  Once each girl passed her "Presentation," she then became a wife of her Patriarch and continued to engage in sex acts with him.  S.E.R. 402:15-403:11.  Allen Harrod informed Michael Labrecque of the requirements of the "Presentation" prior to July, 1991.  E.R. 113:11-114:10.

None of the children reported the abuse because of threats of physical abuse, increased sexual activity, or death.  S.E.R. 390:24-391:14; 501:13-502:7; 564:21-565:19.

<u>The Girls</u>: T., S., and K. Labrecque, and A. Harrod.

The sexual education of the Labrecque girls and Harrod's daughter began when each was very young.  E.R. 111:4-16; S.E.R.

385:24-386:25;[7] 466:9-470:25.[8]  As the patriarch in Texas,

Michael Labrecque was responsible for each of his daughter's

sexual training.  S.E.R. 542:24-543:6.  From the time each girl

was five or six years old, Labrecque began their "training" which

involved acts of masturbation and oral sex.  S.E.R. 466:21-

471:11; 538:5-542:7.  The girls were taught to masturbate him and

themselves (S.E.R. 479:5-480:1; 547:18-548:12), and to drink

ejaculate from Labrecque so as not to waste his "seed."  S.E.R.

67:24-68:19; 468:14-23; 541:1-12.  This continued throughout each

girl's childhood until the girls experienced their first

menstrual cycle.  S.E.R. 332:23-336:24.  Once his daughters began

to menstruate, Labrecque told each girl she would have to undergo

the "Presentation."  S.E.R. 456:9-21; 532:2-538:2.  To accomplish

this, Labrecque purchased airline tickets so each daughter could

travel to Sacramento to live in Harrod's household and undergo

the "Presentation."  E.R. 222:1-11; S.E.R. 76:17-79:24; 337:1-9;

463:1-464:13.  Each girl was given a month to complete all three

sex acts with Harrod.  S.E.R. 485:13-22; 486:11-21; 553:14-15.

If a girl was unable to complete all three acts, she flew back to

Texas for more sex "training" by Labrecque.  S.E.R. 85:8-86:18;

---

[7]A. Harrod said sex with her father began when she was 5
years old. S.E.R. 386:13-15.

[8]S. Labrecque said it began when she was 6 or 7. S.E.R.
470:24-25. Documentary evidence revealed K. Labrecque began to
engage in sex acts with her father when she was 5.  E.R. 189:12-
190:22; S.E.R. 662.

410:10-12; 490:10-20.  The girl was then returned to Harrod for
another attempt at the "Presentation."  S.E.R. 490:21-493:15.  In
the case of T. Labrecque and S. Labrecque, both girls had to
travel to Sacramento twice before completing their presentations
with Harrod.  S.E.R. 409:3-11.  Harrod would inform Labrecque if
one of the girls failed and the reason for her failure, and told
Labrecque he would need to "train" the girl more.  S.E.R. 409:20-
410:12.  When the girls passed their presentations, Harrod
informed Labrecque the girls had passed each phase of the ritual.
S.E.R. 407:3-10; 19-24; 408:6-409:2.  Thereafter, the girls would
continue to live with Harrod and have sex with him.  S.E.R.
497:1-22.

At the time of Harrod's arrest in October 2001, four of
Labrecque's daughters lived with Allen Harrod, including T., S.,
and K.  S.E.R. 381:23-25.

Additionally, when Labrecque visited Sacramento from Texas
in approximately 1996, Harrod's then 10-year old daughter, A.,
was required to orally copulate him.  S.E.R. 412:12-420:1.

The Boy: J. Harrod

At the same time Labrecque's daughters were undergoing their
sexual training, Allen Harrod's oldest son J. was undergoing his
own sex training in Texas while in the care of Michael and
Juliette Labrecque.[9]

---

[9]J.'s initiation into sex began before his 1991 trip to
Texas.  When he was six and living with his parents in Folsom,

12

When J. was 7 years old in July, 1991, he and his mother, Irene Hunt, flew from Sacramento to Fort Worth Texas, so J. could live with the Labrecques to be home-schooled and "trained." E.R. 147:4-17; 326:17-327:1; 341:6-10. Before J.'s flight to Texas, Harrod told J. he was to be trained, but didn't explain what the "training" entailed. E.R. 327: 2-5; 341:6-7.

When J. was 9 years old, however, Harrod told him the "training" would involve sex, and was designed to prepare J. to become Harrod's successor as the next patriarch of their religious order. E.R. 327:2-329:25

Within weeks of his Texas arrival, the 7-year old J. was made to pose with a nude Juliette Labrecque while Hunt took sexually explicit images of them. E.R. 165:15-181:24; 352:9-360:25. This was something Harrod had told Hunt to do prior to her flight to Texas with J. E.R. 142:20-143:12. Harrod told Hunt that when she took the photos, she was to use the Polaroid camera belonging to Michael Labrecque and turn the photos over to Labrecque after they were taken. E.R. 145:8-23.

At the time Hunt flew to Texas, she intended to stay only a month. E.R. 150:4-6. J., however, was supposed to live in Texas with the Labrecques until he graduated from high school. E.R.

---

California, J. was made to witness sex between his two parents. E.R. 336:1-337:4. After J. watched his parents have sex, Irene Hunt orally copulated 6-year old J. at Harrod's direction. E.R. 337:5-11. At the time, Harrod told J. that he had to learn about sex, know what it was, and what to do. E.R. 338:19-339:5.

150:7-11.  Hunt believed that once she arrived in Texas with J.,
the Labrecques were supposed to look after him and she placed J.
in their care.  E.R. 150:23-151:5; 164:15-20.

During her month-long stay, Hunt observed how the Labrecques
ran their household and practiced their religion.  E.R. 162:10-
14; 205:3-10.  She taught the Labrecques a sex ritual related to
their religion.[10]  She observed J.'s home-schooling but was
"[n]ot really" in charge.  E.R. 163:17-164:20.

Weeks after Hunt and J. arrived in Texas, Harrod informed
Hunt it was time for her to photograph J. with Juliette.  E.R.
165:15-166:12; 207:16-18; 220:5-221:4.  Michael Labrecque
purchased the film Hunt used to produce the images.  E.R. 309:12-
22; 314:3-9.  Labrecque had previously told Hunt where to find
the Polaroid camera.  E.R. 208:10-209:12.  This occurred "a
couple of hours" after Hunt and J. arrived in Texas, during a
tour Labrecque gave of his home.  S.E.R. 272:24-273:11.
Labrecque told Hunt the camera was on a bookshelf.  E.R. 208:12.

Just prior to the photographing, Michael Labrecque was
sitting on a couch in the dining room area.  E.R. 362:3-5.
J. was in the living room doing homework.  E.R. 352:14-21;
347:14-17.  Hunt told J. to go upstairs, undress, and go into
Labrecque's bedroom.  E.R. 347:14-20; 352:14-17.  As J. passed

---

[10]This was the "Day of Drunkenness" during which Irene Hunt
observed Michael Labrecque's oldest daughters orally copulate
him.  S.E.R. 43:2-46:18; 63:19-66:4.  At that time the girls
were 7 and 9 years old.  S.E.R. 67:9-18.

14

Labrecque on his way upstairs, Labrecque told J. to "Have fun."
E.R. 362:10-14; S.E.R. 368:5-10. Once in Labrecque's bedroom,
Hunt took the sexually explicit Polaroid images of a nude J.
simulating oral sex and vaginal intercourse with a nude Juliette.
E.R. 352-360.

When Hunt finished taking the photos, she gave them to
Michael Labrecque as Harrod had told her to do. E.R. 183:7-17.
After the photographing, J. dressed himself and returned
downstairs where he observed Labrecque. E.R. 362:18-25.
Labrecque said something to J. that caused J. to believe "that he
knew what was going on." E.R. 363:2-4. J. didn't remember what
Labrecque said, but knew he felt "scared." E.R. 363:3-4.

From the moment J. arrived in Texas in the summer of 1991,
he lived with the Labrecques, under their guardianship. E.R.
365:1-20. Juliette home-schooled him, disciplined him, and cared
and cooked for him. E.R. 261:1-267:23; 268:17-269:7; 270:17-25;
272:20-273:2; 330:2-331:1; S.E.R. 452:13-22. Following his first
day in Texas, J. was in school six days a week from approximately
7 or 8 a.m. to 3:30 p.m. S.E.R. 331:25-332:12. If J. didn't
finish an assignment, or got something wrong, he was required to
continue with his studies past 3:30 p.m. until he finished. E.R.
332:10-24; 453:18-454:9. Michael Labrecque dictated when the
school day started and ended, because he was responsible for
setting the rules. S.E.R. 453:1-454:9. In J.'s mind, the
Labrecques looked after him as soon as he arrived in Texas. E.R.

15

365:17-20.  Labrecque took J. on errands and to an exercise
class, taught him to use the computer, play computer games, and
about their religion.  E.R. 306:25-308:10; 310:8-311:20; S.E.R.
341:6-17; 605.[11]  By his own admission, Michael Labrecque was the
"patriarch on the scene," and as such, had "final authority."
S.E.R. 607.

Throughout the period preceding J.'s trip to Texas in July,
1991, up to the date Harrod was arrested in October, 2001, Harrod
and Labrecque communicated about their religion and the sex
training of their children.  The two communicated frequently on
the phone, via fax, the mail, and the monthly journals Labrecque
sent to Harrod.  S.E.R. 109:8-112:12; 338:13-23; 339:10-16;
435:1-11; 461:13-24; 529:18-530:3; 586.  As an example, prior to
Hunt's travel to Texas in the summer of 1991, Harrod discussed
with Labrecque the details of Hunt's and J.'s upcoming trip.
E.R. 304:12-15.

Labrecque also shared with Harrod, prior to Hunt's 1991
trip, his accounts of his sexual training of his daughters.
S.E.R. 597-649; 653-665.  In a journal entry dated July 14, 1991,
Labrecque wrote, "The first act was a jerk-off in the shower with

---

[11]In his journal entry of Sunday, August 4, 1991, just four
days after young J. arrived in Texas, Labrecque wrote "I took
J█████ with me to buy a new chain for the dog..."  S.E.R. 605.
On August 6, 1991, Labrecque wrote, "Last night after journal
entries were recorded for the day I was left with baby-sitting
the kids while Mary and Rebekah [Irene Hunt] went to the sewing
store."  S.E.R. 451:14; 606.

a little help from C of C." E.R. 189:12-23; S.E.R. 662. C of C stood for child of choice who was Labrecque's daughter K. E.R. 189:24-190:12. At the time, K. was 5 years old. E.R. 190:21-22.

Labrecque's sexual journal for the prior month, May, 1991, likewise included an entry about K., indicating that on May 25, 1991, "The first act of the day was a 9:00 a.m. jerk-off in the shower with a little help from the C of C." E.R. 190:23-191:21; S.E.R. 601.

Labrecque also shared with Harrod his account of the "Day of Drunkenness" that occurred in Texas just prior to Hunt's return to Sacramento. S.E.R. 617, 618, 629. In his sex journal entry for August 20, 1991, Labrecque wrote, "The remainder of the day was spend with Mary, D1, and D2 attempting to drain my dick of every life giving force. I was able to have three acts and attempted a fourth until somewhere around 2:00 in the morning, but my body would not cooperate." S.E.R. 90:10-20.[12]

Labrecque continued to chronicle his daily and sexual activities after Hunt departed for Sacramento in late August, 1991. On August 30, 1991, he wrote, "the next act was with D2 in

---

[12] D1 referred to 9-year old A. Labrecque, and D2 was 7-year old T. Labrecque. S.E.R. 90:10-20; 92:18-24. Mary referred to Juliette Labrecque. E.R. 88:16-89:3. In addition to D1 and D2, Labrecque also used M2 for A. Labrecque; M3 for T. Labrecque; M4 for S. Labrecque, and CC stood for child of choice, who was K. Labrecque. S.E.R. 151:4-152:6.

17

the nursery.  It was top door[13] with full honor."  S.E.R. 92:18-24.

In his journal dated December 4, 1992, Labrecque wrote about a sexual encounter with his then 7-year old daughter S.  S.E.R. 440:16-19; 645.

> The only act of the day happened with M4.  I was sitting on the chair in the living room after arising from my relaxation period following the sabbath meal.  The girl just simply grabbed my dick and insisted on spending time with me.

S.E.R. 200:4-11; 645.

On December 11, 1992, Labrecque wrote,

> The next act happened an hour later when M3 and M4 teamed up to turn on me.  They removed their clothing and took turns at my Dick. One would kiss me while the other would work between my legs.  It didn't take long for me to rise to the occasion and I was surprised to be able to have another act so quickly.  M3 was the biggest turn on as she was presenting herself in a very sexy manner and she took the final moment T/D with full honor.  A flower.  T/D.

S.E.R. 200:16-25; 646.

Labrecque continued to write on December 12, 1992,

> The fifth act of the day happened just prior to the time I was planning to go to bed.  I gave M3 the opportunity at an encounter ... and I received a top door to completion.

S.E.R. 201:7-13; 646-647.

In his journal for December 13, 1992, Labrecque wrote,

> The sixth and final act happened when I gave an

_____

[13]Top Door (T/D) was code for oral sex; Back Door (B/D) meant anal intercourse; and Front Door (F/D) meant vaginal intercourse. S.E.R. 92:25-93:3; 149:24-150:17.

18

opportunity to M4,... and I received a top door to completion.

S.E.R. 201:22-202:6.

Finally, in a journal entry dated December 23, 1992, Michael Labrecque referenced a sex act he engaged in with his wife Juliette (Mary). S.E.R. 441:10-21. In this entry, Labrecque recorded he engaged in a "Top Door" with Juliette, and then he wrote,

> The magazines did something at first but I quickly lost interest in them. In fact, I had to ignore them all together in order to complete the act. Ever since I have lost access to M2 and M3,[14] my sex life has been somewhat dull. It's like being used to driving a Ferrari and then having to go back to a old Chevy. Before you got the new Ferrarri, you were perfectly happy with the old Chevy. But now that you have see what it was like to drive that fancy sports car, you don't want to go back to that old Chevy.

S.E.R. 202:16-203:8; 648.

During this time Labrecque also engaged in sex acts with his daughters upon Harrod's announcements of "Days of Rejoicing." S.E.R. 542:8-543:14; 583, 584, 585. These days of rejoicing occurred prior to J.'s trip to Texas on July 31, 1991 and during J.'s first month in Texas. S.E.R. 598; 628; 631.[15] Labrecque's

---

[14]At Harrod's direction, Labrecque was to have "lost access" to A. and T. Labrecque for sex, but as Labrecque's journals revealed, he continued to engage in sex acts with these girls. S.E.R. 202:16-203:23.

[15]A Day of Rejoicing occurred when Allen Harrod had engaged in a certain number of sex acts himself. When he had reached the threshold of 50 sex acts, he would call Michael Labrecque and provide permission for Michael Labrecque to have "lots of sex" with "anyone." S.E.R. 91:10-92:7.

19

journals revealed he engaged in numerous sex acts with his daughters as part of their training for their ultimate sexual ritual - the "Presentation" - with Allen Harrod, and that this sexual conduct traversed the time J. Harrod lived at the Labrecque's Fort Worth home.[16]  S.E.R. 597-665.

As for J.'s sex training, throughout his early years in Texas, Labrecque ordered J. and his young daughters to participate in "Adam and Eve" days, which required all of the young children in the house to spend the day naked. S.E.R. 259:21-260:3; 364:20-366:18.  J. was also ordered to have sex with Labrecque's daughters and made to participate in sex rituals. S.E.R. 329:7-332:22; 511:21-516:23; 587-589; E.R. 365:21-366:19.  All of J.'s training in Texas was to prepare him, in the event Allen Harrod died, to take over and lead the family.

---

[16]S. Labrecque reported she was made to engage in sex acts with her father beginning when she was about six or seven. S.E.R. 470:22-25.  This would have occurred sometime between 1991 and 1992, about the time J. Harrod began to live with the Labrecques.  S.E.R.  440:18-19; 470:24-25.  Michael Labrecque started by masturbating himself in front of S. and then began to masturbate her.  S.E.R. 466:16-23; 467:7-12.  He also forced her to orally copulate him.  S.E.R.470:8-21.  Labrecque also told S. to drink his ejaculate after he climaxed.  S.E.R. 468:14-23; 470:17-21.  When he first began the sexual activity, Labrecque did not tell S. why he tried to sexually stimulate her, but when she got older he explained he was getting her ready for her presentation.  S.E.R. 469:24-470:5.

S.E.R. 328:3-13; 437:7-25.  In that event, J. was to marry his younger sister, A.  S.E.R. 438:1-2.[17]

### SUMMARY OF ARGUMENT

Defendants argue there was insufficient evidence upon which to base Harrod's conviction of Count Two and Labrecque's conviction of Count Three.  Count Two charged a violation of 18 U.S.C. § 2251A(a) and alleged that Harrod, as the parent or guardian of J. Harrod, transferred custody or control of J. – a minor – with knowledge that as a consequence of such transfer, he would be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct.  Count Three charged Michael Labrecque with a violation of the companion statute, 18 U.S.C. § 2251A(b) – obtaining custody or control of J. – a minor – knowing that as a consequence of the assumption of custody, J. would be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct.  Defendants argue that the charged statutes were not intended to prohibit the conduct that occurred in this case.

At trial, jurors were presented with a significant volume of circumstantial and direct evidence demonstrating that Harrod

---

[17]Harrod told his daughter A. that J. was in Texas to prepare for the time when "something happened to Allen. And when Allen dies, all the people in oneness with him are going to commit suicide, and J. will be the one to lead the family." S.E.R. 437:21-25.

intended to transfer custody of his son to the Labrecques with knowledge that one consequence of this transfer would be the production of sexually explicit images of J. Where evidence revealed responsibility for, and supervision of J., was effectively transferred to Labrecque at the time the photos were taken, Harrod was properly convicted of the offense. Similarly, the evidence revealed that Labrecque's assumption of custody and control of J. was with his knowledge that one consequence would be the production of sexually explicit images of J., so he was properly convicted of Count Three.

Labrecque also argues there was insufficient evidence to convict him of Count One which charged aiding and abetting the interstate transportation of a minor with the intent that minor engage in unlawful sexual conduct. Where the evidence introduced at trial revealed that Michel Labrecque assisted in the travel of J. to Texas; that at the time of J.'s travel Labrecque was well-steeped in the religious rituals devised by Harrod; that Harrod and Labrecque had spoken about J.'s trip to Texas prior to his travel; that Labrecque participated in the production of sexually explicit images of J. by providing a camera and the film used to produce the images; that he informed Hunt of the location of the camera within hours of J. and Hunt's arrival in Texas; that Labrecque had engaged in numerous sex acts with his children prior to, and after J's trip to Texas; and was complicit in involving J. in sex acts with his daughters while the boy lived

22

in Texas, jurors had more than sufficient evidence to find Labrecque knew J.'s travel to Texas was with the intent J. would be made to engage in unlawful sexual activity.  Labrecque was, therefore, properly convicted of Count One.

The government concedes error in sentencing for Counts One and Seven, as both defendant's received sentences of 15 years for each count.  At the time the offenses occurred, the statutory maximum for each charge was 10 years.

Where, however, defendants failed to show they lacked the present and future ability to pay the fines imposed by the district court, this Court should affirm the district court's order that each pay a $25,000 fine.

ARGUMENT

I.   Harrod's and Labrecque's Convictions for Counts Two and
     Three Must Be Affirmed Where there Was Sufficient Evidence
     From Which Jurors Could Conclude The Taking of Sexually
     Explicit Photographs of J. Was Causally Related to the
     Transfer of Harrod's Transfer of Custody or Control of J. To
     Labrecque

    A.   Standard of Review

Defendants make a sufficiency of the evidence argument alleging that at the time the child pornographic images were produced, Harrod had not yet transferred custody or control of his son J. to the Labrecques.  Defendants also argue the taking of the pornographic pictures of J. was not causally related to J.'s custodial transfer to the Labrecques.  In so arguing, they assert that the statutes under which they were charged were not

23

intended to address the conduct that occurred in this case.  Def.
Brf. 28-29.  This Court's review of the scope of § 2251A is de
novo.  <u>United States v. Iverson</u>, 162 F.3d 1015 (9th Cir.
1998)(district court's interpretations of federal statute
reviewed de novo); <u>United States v. Buculei</u>, 262 F.3d 322, 331
(4th Cir.2001).[18]

Once the Court has ascertained the scope of 2251A and
determined it potentially encompasses the defendant's conduct,
then the Court shall decide whether the evidence was sufficient
for the jury to conclude that defendants' conduct fell within the
statute's prohibitions.  In conducting such a review, <u>Jackson v.
Virginia</u>, 443 U.S. 307, 319 (1979), requires a court of appeals
to determine whether "after viewing the evidence in the light
most favorable to the prosecution, any rational trier of fact
could have found the essential elements of the crime beyond a
reasonable doubt."[19]  <u>See also United States v. Nevils</u>, 598 F.3d
1158 1163-64 (9th Cir. 2010)(<u>en banc</u> decision)(Adopting a two-

---

[18]This Court also reviews de novo the denial of a motion for
acquittal.  <u>United States v. Inunza</u>, 580 F.3D 894, 899 (9th Cir.
2009).  Both defendants moved for a judgment of acquittal after
the close of evidence and after verdict. C.R. 252, 253; E.R. 410.

[19]This means that "a court of appeals may not usurp the role
of the fact finder by considering how it would have resolved the
conflicts, made the inferences, or considered the evidence at
trial...[r]ather, when faced with a record of historical facts
that supports conflicting inferences, a reviewing court must
presume, even if it does not affirmatively appear in the record,
that the trier of fact resolved any such conflicts in favor of
the prosecution and must defer to that resolution.  <u>United States
v. Nevils</u> 598 F.3d 1158, 1164 (9th Cir. 2010).

24

step inquiry for considering a challenge to a conviction based on sufficiency of the evidence). After viewing the evidence in the light most favorable to the prosecution to determine if any rational trier of fact could have found the essential elements beyond a reasonable doubt, the court must then determine whether the evidence is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. Id. at 1164. The reviewing court must respect the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts. United States v. Goode, 814 F.2d 1353, 1355 (9th Cir. 1987).

      B.    Defendants Were Properly Charged Under
          18 U.S.C. § 2251A

Defendants assert that the harm § 2251A seeks to address is the buying, selling, or transfer of custody or control of children for the purpose of producing child pornography and that the statute cannot reach the conduct in this case, because the transfer of J.'s custody was for other purposes and the production of the images was not a consequence of the custody transfer. Def. Brf. at 26. There is nothing in 18 U.S.C. § 2251A stating it may be applied only under circumstances in which child pornography production is the sole purpose of the custodial transfer. The plain language of § 2251A simply prohibits a parent or guardian from transferring custody or

25

control of a minor, with knowledge that as a consequence of the transfer the minor would be portrayed in a visual depiction engaging in, or assisting another person to engage in sexually explicit conduct.

Notwithstanding the clarity of the statute, however, defendants argue this statute was only intended to bring to justice those who buy, sell "and transfer custody [] or control of children for the purpose of producing child pornography." Def. Brf. at 28. Defendants opine that the language "as a consequence of" in the statute "clearly requires a causal connection between the transfer of custody or control of the child and the production of child pornography," but then contends if there is any doubt on this point, the "rule of lenity" requires that the statute be strictly construed against the government and in favor of the defendants. Id. at 29.

There is nothing ambiguous about the language of this statute. Simply because it may authorize prosecutions "not expressly anticipated by Congress," or the defense in this case, "does not demonstrate ambiguity. It demonstrates breadth." Buculei, 262 F.3d at 332. Further, defendants' ability to "articulat[e] a narrower construction [of § 2251A(b)(2)]...does not by itself make the rule of lenity applicable." Id. at 333.[20]

---

[20]The Buculei case is one of only two reported cases the government could find focusing on the breadth of § 2251A. In Buculei, the defendant was indicted on several charges relating to his enticement of a 13-year old girl for sex which he

This Court need not "'determine the precise contours' of the statute if [defendant's] conduct is reasonably encompassed by the statute's provisions." <u>Smith v. United States</u>, 508 U.S. 223, 238-39 (1993).

Moreover, it is irrelevant that defendants' prosecution under this statute is "a novel construction," or that it is the first time the Government has proceeded under this theory. <u>Buculei</u>, 262 F.3d at 333, citing <u>United States v. Knox</u>, 32 F.3d 733, 751 n.15 (3d Cir. 1994)("[T]he rule of lenity is not dependent whatsoever on whether there have been successful prosecutions under the statute at issue....[Otherwise] the government [would never] be able to successfully proceed under a theory different from that which has yielded convictions in the past."). In short, defendants' conduct with respect to J. Harrod fell squarely within the plain language of § 2251A. That Congress may not have foreseen a situation where a parent or guardian may have had additional reasons for transferring and assuming custody of a minor in addition to the production of sexually explicit images, or that there may have been another

---

videotaped. In arguing he was improperly charged for violating 18 U.S.C. § 2251A(b)(2), Buculei argued that the statute encompassed only the "custody or control" of children that is of the same degree of control as is exercised by a parent or guardian. He also insisted that, even if the statutory provisions reached his conduct, the doctrine of fair notice and the rule of lenity required that a judgement of acquittal be granted on his conviction. The Fourth Circuit soundly rejected his claim and affirmed his conviction, finding that he exercised temporary control of the girl.

person present who at times cared for the minor, should not affect this Court's conclusion that the defendants were properly prosecuted under these statutes.[21]  If the statute unambiguously reaches a defendant's conduct, as it does here, the Court's inquiry is complete.  Clearly, there is nothing in the legislative history of § 2251A that requires it be limited to the fact pattern defendants prescribe.  Def. Brf. at 28-29.  Section 2251A was enacted as part of a comprehensive scheme created by Congress to eradicate the sexual exploitation of children and eliminate child pornography, and therefore warrants a broad sweep.  United States v. Frank, 599 F.3d 1221, 1231 (11th Cir. 2010).

The rule of lenity, which defendants ask this Court to apply, only applies when there is grievous ambiguity or uncertainty in the statute and when after seizing everything from which aid can be derived, the Court can make no more than a guess as to what Congress intended.  United States v. Iverson, 162 F.3d 1015, 1025 (9th Cir. 1998).  Unless there is a clearly expressed legislative intent to the contrary, and defendants can cite to none, the statutory language should be regarded as conclusive. Buculei, 262 F.3d at 331.

---

[21]Indeed, in denying defendants' motions for judgments of acquittal on Counts Two and Three, the district court acknowledged that the statute could reach persons who share custody or control of a minor and who obtain temporary custody or control of a minor.  E.R. 59:15-60:11.

The issue then, is whether the evidence sufficiently showed the defendants transferred or assumed control or custody of the minor with knowledge that as a consequence, the minor would be portrayed in a visual depiction engaging in or assisting another person to engage in sexually explicit conduct.

C.    Where There Was Sufficient Evidence Demonstrating Harrod Transferred Custody Or Control of 7-Year old J. to Labrecque With Knowledge That One Consequence Was that J. Would Be Portrayed in Sexually Explicit Images, Defendants' Convictions for Counts Two and Three Must <u>Be Affirmed</u>

Allen Harrod challenges his conviction on Count Two, and Labrecque challenges his conviction of Count Three, arguing there was insufficient evidence to show Harrod and Hunt transferred custody of their minor son to the Labrecques at the time Hunt took the sexually explicit images.  In order to prove Count Two, the government had to demonstrate beyond a reasonable doubt that:

1) Allen Harrod was a parent, or legal guardian having custody or control of a minor child, identified as J. Harrod;[22]

2) Harrod transferred custody or control of the minor child, J. Harrod, to another;

3) Harrod transferred such custody or control knowing that as a consequence, J. Harrod would be portrayed in a visual depiction engaging in, or assisting another person to engage in sexually explicit conduct; and

_____

[22]Clearly the government proved that Allen Harrod was the parent or legal guardian of J. having custody and control of "J". E.R. 102:22-103:2; 321:25-322:18.

29

4) in the course of the conduct alleged, the minor child traveled in or was transported in interstate or foreign commerce.

To prove Count Three as against Michael Labrecque, the government had to prove he obtained custody or control of the minor, or aided and abetted such conduct, with knowledge that, as a consequence of his assumption of custody or control, the minor would be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct. The government also had to show that in the course of the alleged conduct, the minor traveled in or was transported in interstate or foreign commerce.[23]

There is little caselaw available interpreting the scope of 18 U.S.C. §2251A, and what is meant by custody and control.[24] In United States v. Buculei, 262 F.3d 322, 331-35 (4th Cir. 2001), the Fourth Circuit addressed head on the reach of this statute and what is meant by custody or control, observing that the statutory term "custody or control" was clearly defined in 18 U.S.C. § 2256(7) as "includ[ing] temporary supervision over or

---

[23]The defendants appear to concede that there was no question that the government proved the last element of the offense, as there was ample testimony that "J" flew from California to Texas to effect this transfer of custody.

[24]Words not defined in a statute should be accorded their ordinary and plain meaning because it's assumed Congress uses words in a statute as they are commonly understood. United States v. Frank, 599 F.3d 1221 1234 (11th Cir. 2010).

30

responsibility for a minor legally or illegally obtained[.][25]
<u>Buculei</u>, 262 F.3d at 332. In <u>United States v. Frank</u>, 599 F.3d
1221, 1236 (11th Cir. 2010), the 11th Circuit ratified the
definition of custody and control adopted by the <u>Buculei</u> court
and further observed that "'[c]ontrol' does not require the
exchange of a minor from a third party to the defendant. <u>Id</u>.
For example, one can obtain control over a minor by kidnaping him
or her." (citing <u>Buculei</u>.) The <u>Frank</u> court further stated that
custody or control should be given an "expansive definition," and
that neither custody nor control require ownership of the minor
or any other permanent relationship; rather, the "custody or
control" can be "temporary." <u>Id</u>. Given such definitions, there
was sufficient evidence establishing Harrod intended to transfer
and did effectively transfer his supervision and responsibility
for his son J. to the Labrecques in Texas.

       1.    Harrod's Intent To Transfer Custody and
             <u>Control</u>.

It was Harrod's idea that J. should fly to Texas to live
with the Labrecques for home-schooling and for "training." E.R.
140:12-141:7; 326:17-327:10; 340:17-341:8. It was Harrod who
told J. his "training" would involve sex, and that the sex
training was intended to prepare J. to be the next patriarch.

---

    [25]This definition is consistent with the district court's
instruction that the term "custody or control of a minor"...
included temporary supervision over or responsibility for a minor
whether legally or illegally obtained. S.E.R. 689:1-4.

E.R. 326:17-329:21; 325:25-326:2.  As the patriarch in Texas, Michael Labrecque was Harrod's surrogate in teaching family members the religion they both followed.  S.E.R. 263:6-11; 341:2-17; 444:20-445:5.  It was Labrecque's role to train members of the Texas branch in the religion, which family members recalled, "was all about sex".  S.E.R. 341:2-17; 445:2-5.  It was also Allen Harrod's idea that Hunt photograph J. engaged in sexually explicit poses with Juliette.  E.R. 142:20-143:12.  It was Harrod's idea that Hunt should ask Labrecque for his Polaroid camera to shoot the pictures.  E.R. 145:8-17.  It was Harrod's idea that Hunt give the photos to Labrecque.  E.R 145:14-146:1.  Such evidence was sufficient to demonstrate to jurors that Harrod intended not only to transfer custody or control of J. to the Labrecques, but also that he knew that as a consequence of J.'s placement in the Labrecque home, and their assumption of his custody, he would be portrayed in sexually explicit images and be made to engage in unlawful sexual activity.  While Hunt may have been the one to orchestrate the photo-shoot, that doesn't mean she maintained sole control over her son when the pictures were taken.  It also doesn't mean the photos weren't taken as a consequence of the transfer of J. to the Labrecques.  To suggest as defendants do, that Hunt maintained absolute control over her son during the time she was in Texas and the photo-shoot, completely disregards the volume of evidence demonstrating the

32

control the Labrecques asserted over J. the moment he arrived in
Texas.

    2.   <u>Labrecque's Assumption of Custody</u>.

Like Harrod, Labrecque adopts an all or nothing approach to
the issue of who had custody or control over J. during the three
weeks his mother was also in Texas.  He argues that because Hunt
was J.'s mother and could have decided to return J. to
California, and because she was the "director" of the photo-
shoot, Michael Labrecque didn't exercise control or custody over
J.  Def. Brf. at 29.  As the evidence demonstrated and as the
jury found, however, the three weeks Hunt was in Texas in August,
1991, was a time when she and the Labrecques each had some level
of custody and control over J.  E.R. 150:19-151:5.

The schooling and training of J. was a duty the Labrecques
fully embraced.  Immediately upon J.'s Texas arrival, Juliette
began to home-school him.  E.R. 330:10-332:24; S.E.R. 690-718.[26]

---

[26]In Juliette's August journal, she chronicled her daily work
with and care of J.  On August 4, 1991 she wrote, " After lunch,
Joseph (Labreceque) and I was teaching J███ school."  S.E.R.
693.  On August 5, 1991, she wrote, "This morning until 3:30 p.m.
I worked with J███ one on one and doing homework in between
breaks just to get the feel of the routine...I kept telling him
he has to learn and do his homework, his school work."  S.E.R.
694.  On August 6, 1991 she wrote, "After lunch I taught J███
school.  All day, I concentrated on getting him to remember the
letter sounds that he's done so far."  S.E.R. 695.   On August 7,
1991, Juliette wrote, " During scripture study, J███ woke up
crying, and I went to check on him.  I noticed that one of his
ears was turning red.  I mentioned to Joseph and my matriarch
that J███'s ear was red.  Joseph looked in the red ear with the
ear speculum and saw what looked like a bug in his ear... Joseph
continued to flush out his ear with some peroxide and water so it

It was Michael Labrecque who dictated when the school day started. S.E.R. 453:1-6. It was Michael Labrecque who set the rules and imposed discipline. S.E.R. 453:22-454:9.[27] From the moment he arrived in Texas in 1991, J. was in school six days a week from approximately 7 or 8 a.m. to 3:30 p.m. or even later if he hadn't finished his work. E.R. 331:25-332:24; 453:18-454:9. In Irene Hunt's mind, Labrecque was the patriarch – the authority figure - over his Fort Worth household, even though Hunt was present. E.R. 194:6-11; S.E.R. 263:6-11; 285:8-23; S.E.R. 607.[28] In J.'s mind, both Labrecques looked after him as soon as he arrived in Texas when he was 7. E.R. 365:17-20. Michael Labrecque took J. on errands and to an exercise class, cared for him when he was bitten by fire ants, and taught him to use the computer, play computer games, and about their religion. E.R. 306:25-308:10; 310:8-311:20; S.E.R. 341:6-17; 605, 695-696.[29]

_____

wouldn't get infected." S.E.R. 695-696. On August 9, 1991, Juliette wrote, "My matriarch did the cooking for our Sabbath meal while I tended to J████." S.E.R. 698. According to Hunt's timeline, all of this occurred before the sexually explicit pictures were taken of J. E.R. 165:15-23.

[27]On August 16, 1991, Juliette wrote that the "kids", including J████, "were noisy most of the day (pain in the butts)." They were counseled by "Joseph" who got angry and sent them to the bedroom. S.E.R. 705.

[28]Hunt was there only to observe. She did not tell Juliette how to teach her son. S.E.R. 272:21-23.

[29]In his journal entry of Sunday, August 4, 1991, just four days after young J. arrived in Texas, Labrecque wrote, "I took J████ with me to buy a new chain for the dog..." S.E.R. 605. On August 6, 1991, Labrecque wrote, "Last night after journal

34

Defendant argues, however, that "legal custody" of J. hadn't been transferred to the Labrecques prior to the photo-shoot, and during the photo-shoot it was Hunt who directed the scene and therefore she was the person who exercised sole control over J. Def. Brf. at 20, 25.

First it doesn't matter whether J. was in the Labrecques' "legal custody." The government didn't argue that, nor does the statute require the transfer of "legal custody." All that the statute refers to is "custody or control." Given that custody or control of a minor "includes temporary supervision over or responsibility for a minor", and that the Labrecques exercised such supervision over J.'s activities, J. was in Labrecque's custody or control. The fact Hunt remained in Texas to observe and provide some transition for J.'s life with the Labrecques doesn't mean the Labrecques didn't also exercise control and custody over J. at the time the photos were taken.

Defendant also disregards completely the role Juliette Labrecque played in the care, training, and photographing of J., by painting her as a weak and unwitting dupe who simply stood by while Hunt looked after her son. Juliette had been teaching J. for about 14 days prior to the photo-shoot. E.R. 165:15-23. During that time, she had exercised considerable control over J.

---

entries were recorded for the day I was left with baby-sitting the kids while Mary and Rebekah [Irene Hunt] went to the sewing store." S.E.R. 606; 451:14.

as his teacher and co-caretaker.  S.E.R. 690-705.  She was the
one in whose care J. was placed.  E.R.  365:1-20.  Given such
evidence, and her active participation in the photographing of J.
engaged in sexually explicit conduct, it cannot be said that J.
wasn't also under Juliette's temporary supervision at the time
the pictures were taken.

Just prior to the photo-shoot, Juliette was well aware of
what was to take place and actively participated in the
production of the images.[30]  E.R. 172:7-177:11; 179:19-181:13.
She could have refused to participate but didn't, and voiced no
objection. E.R. 181:11-13; 212:17-18.  Juliette also played a
role in the sexual abuse of her young daughters close in time to
when she was photographed with J.  S.E.R. 43:2-46:18; 63:19-
67:16.  Accordingly, jurors could have easily inferred from her
participation in the photo-shoot, that the photographing of J.
was simply part of the Labrecques' efforts to further sexualize
the children in their care, to include young J. Harrod.

At a minimum, Michael Labrecque aided and abetted his wife
in this criminal activity by providing his home, his bedroom, the
camera, and the film for the production of the images.  Under the
theory he aided and abetted the illegal conduct of Juliette who

---

[30]Juliette was not "commanded" to participate as defendants
assert.  Def. Brf. at 29.  Hunt "told her that we needed to go
upstairs."  E.R. 170:22-23.  When told what would be involved,
Juliette did not react in any way, other than to assume the
sexual positions requested.  E.R. 173:6-10.

36

worked in concert with Hunt to produce the images, there was more than sufficient evidence to show Labrecque's complicity in the unlawful conduct.  Evidence Labrecque told J. to "Have fun," prior to the conduct, revealed his criminal conduct was knowing.

In truth, however, the evidence revealed Michael Labrecque's role in the offense was far more direct as he was a party to the overall scheme to foist his religious beliefs and practices on his and the Harrod children.  Where there was sufficient evidence from which jurors could have concluded he had assumed partial if not complete control of J. at the time he was photographed with Juliette, knowing that as a consequence, J. would be portrayed in sexually explicit images, Michael Labrecque's conviction of Count Three should be affirmed.

> 3.   Where There Was a Causal Relationship Between the Transfer of Custody and the Production of the Sexually Explicit Images, Defendants' Convictions Should be Affirmed

Defendants correctly state that to be convicted of 18 U.S.C. § 2251A(a)(1) jurors were required to find beyond a reasonable doubt that Harrod had "knowledge that as a consequence of the transfer of custody or control of the minor, the minor (J.) would be portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct. Similarly, Labrecque correctly asserts that to be convicted of 18 U.S.C. § 2251A(b)(1) jurors were required to find beyond a reasonable doubt that he had "knowledge that, as a consequence of

37

the obtaining of custody or control of the minor, the minor (J.) would be portrayed in a visual depiction engaging in, or assisting another person to engage in sexually explicit conduct. "Consequence" is defined as "the effect, result, or outcome of something occurring earlier." Random House Dictionary 2010. Therefore, to satisfy the statute, the defendants' production of child pornography must have been the result, effect or outcome of the transfer of control or custody.

### Allen Harrod

Even before J. traveled to Texas, Harrod sought to de-sensitize J. about sex when he made the 6-year old boy watch him having sex with Hunt and then ordered Hunt to orally copulate J. E.R. 336:1-340:20. Then, as part of his plan to make him the next patriarch, Harrod sent J. to Labrecque. E.R. 140-19-20; 340:15-341:8. Harrod told Hunt it was so J. could be home-schooled. E.R. 140:23. He told J. it was so he could be "trained" in sex so as to be the next patriarch. E.R. 326:17-329:21; 341:6-7. Once Harrod decided to send J. to Texas, Harrod then ordered Hunt to take the sexually explicit images of J. and Juliette. E.R. 142:20-144:5. Harrod told this to Hunt a day or two before she departed for Texas. E.R. 143:1-12. While it wasn't until two weeks into Hunt's visit that Harrod called Hunt and ordered her to take the photos, what's pivotal is that at the time Harrod formed the intent to transfer custody of J. – prior to J.'s trip -- he knew that one consequence would be the

38

production of child pornography.  At the time the photos were taken, J. had already joined the Labrecque family, was being home-schooled by Juliette, and being cared for by both Labrecques.  Therefore, contrary to defendants' claim, the transfer of J.'s custody was part of the causal chain that led to the production of sexually explicit images of the boy.  Had it not been for Harrod's decision to transfer custody or control of J. to the Labrecques, J. would not have been in Texas, and the sexually explicit images would not have been taken.  What's more, had the Labrecques not exercised any supervision, control, or custody of J. during the approximately 14 days prior to the photo-shoot, it is unknown whether the shoot would have resulted in the production of the images.  Defendants can make up any number of different fact patterns in their effort to break the causal connection between the knowing transfer of custody and control and the taking of the photographs, but those fact patterns were not before this jury.

### Michael Labrecque

Labreque had engaged in sex acts with his minor daughters prior to and after J. moved to Texas.  E.R. 189:12-191:21; S.E.R. 601, 662.  Labrecque also pointed out the camera and purchased the film Hunt was to use to photograph Juliette and J.  E.R. 166:6-12; 168:1-8; 207:22-23; 208:10-14; 309:20-22; 314:6-9.  As J. walked to Labrecque's bedroom just before being photographed, Labrecque told J. to "Have fun."  E.R. 362:10-14; S.E.R. 368:5-

10.  After J. was finished, Labrecque said something to J. that caused J. to think Labrecque knew J. had been photographed with Juliette engaged in sexually explicit conduct.  E.R.363:2-4. This frightened J.  E.R. 363:3-4.  Such evidence demonstrated that at the time Labrecque was assuming control of J., he knew that one consequence was that sexually explicit images would be taken of J.

Further, it was not lost on jurors that Juliette agreed to participate in the photo-shoot.  This was at a time when the Labrecques were also involved in sex acts involving their two older daughters.  It was not a reach for jurors to conclude that Juliette's willing participation in the production of sexually explicit images of J. was just one more step in the sexual training of J., who at the time was in her care and custody.[31]

Jurors also learned that Labrecque had been a follower of Harrod's religion since 1983, that the two were very close and communicated constantly - before, during, and after Hunt's trip to Texas in July/August 1991.  E.R. 117:24-118:7; 152:22-156:7;

---

[31]Juliette's participation in the photo-shoot helped to further the Labrecques' control over young J.  To force a young boy to engage in such conduct with persons who two weeks prior were essentially strangers, who were and would continue to be in control of his very existence, was just one more step in establishing their control over the boy.  One can only wonder what this 7-year old boy must have thought following the photographing of the simulated sex acts, knowing his mother was soon to depart, and the only adults he could turn to were the same persons who were complicit in the production of the images.

248:6-7; S.E.R. 86:8-15; 99:5-10; 106:11-23; 108:21-110:13; 111:4-11; 111:25-112:12; 114:19-115:11; 119:16-23; 120:4-17; 146:19-147:17; 212:1-215:21; 221:17-223:19; 224:19-225:24; 234:19-235:11; 461:13-24. While not direct evidence of Michael Labrecque's knowledge and intent, such circumstantial evidence provided the basis from which jurors could infer Harrod had told Labrecque that Hunt was to take sexually explicit images of J. after J. was placed in their care.

Further, the Labrecques had a history of taking nude photos of the girls in their custody and sending them to Allen Harrod annually. S.E.R. 81:11-83:15; 95:6-14; 130:4-9. This evidence, contributed to the jury's finding that when J. arrived in Texas in 1991 and was placed in the Labrecques' custody and under their control, it was with knowledge that one consequence was that J. would be portrayed in sexually explicit images.

Where there was sufficient evidence from which a rational trier of fact could have found that Harrod transferred, and Labrecque assumed, custody/control of J., knowing he would be portrayed in sexually explicit images, the defendants' convictions of Counts Two and Three must be affirmed.

II. Sufficient Evidence Was Admitted From Which Jurors Could Conclude Labrecque Aided and Abetted the Interstate Travel of J. With The Intent Harrod's Son Engage in Unlawful Sexual Conduct

A. Standard of Review

Both defendants moved for a judgment of acquittal after the

41

close of evidence and after verdict. This Court reviews de novo the denial of a motion for acquittal. United States v. Inunza, 580 F.3d 894, 899 (9th Cir. 2009). Review of the sufficiency of the evidence to support the conviction, however, is governed by Jackson v. Virginia, 443 U.S. 307, 319 (1979) which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See also United States v. Nevils, 598 F.3d 1158, 1163-64 (9th Cir. 2010)(en banc decision).

Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction. United States v. Jackson, 72 F.3d 1370, 1381 (9th Cir. 1995), cert. denied, 116 S. Ct. 1546 (1996). On assessing sufficiency of evidence, the reviewing court must accept the tenet that all reasonable inferences supporting the verdict must be drawn in favor of the government as the prevailing party below, and it is the exclusive function of the jury to determine credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts. United States v. Brady, 579 F.2d 1121, 1127 (9th Cir. 1979); and United States v. Goode, 814 F.2d 1353, 1355 (9th Cir. 1987).

      B.    Where there Was Sufficient Evidence Showing Labrecque
            Knew J. Harrod Would be Required to Engage in Unlawful
            Sexual Conduct Prior to J.'s Travel to Texas,
            <u>Labrecque's Conviction for Count One Should be Affirmed</u>

While there may not have been direct evidence Labrecque knew of the sexual purpose of J. Harrod's travel to Texas, the government offered extensive circumstantial evidence to establish this knowledge. Circumstantial and testimonial evidence are indistinguishable insofar as the jury's fact-finding function is concerned, and circumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred. <u>United States v. Brady</u>, 579 F.2d 1121, 1127 (9th Cir. 1979).

Labrecque was the patriarch on the scene in Texas at the time J. traveled to Texas on July 31, 1991. S.E.R. 606, 607. Harrod and Labrecque communicated frequently. E.R. 117:24-118:7; 152:22-156:7; 248:6-7; S.E.R. 86:8-15; 99:5-10; 106:11-23; 108:21-110:13; 111:4-11; 111:25-112:12; 114:19-115:11; 119:16-23; 120:4-17; 146:19-147:17; 212:1-215:21; 221:17-223:19; 224:19-225:24; 234:19-235:11; 461:13-24. In fact, Hunt overheard a phone conversation between Harrod and a person she believed was Labrecque just prior to her Texas trip. E.R. 152:22-157:5. During this conversation, Harrod provided information about Hunt and her son's travel plans and arrival time in Texas. E.R. 157:2-3. Hunt also revealed that Labrecque had been a follower of Harrod's religion and its practices since 1983. E.R. 108:17-21.

43

Upon Hunt's arrival in Texas, it was Michael Labrecque who picked up Hunt and her son from the airport. E.R. 151:21-:152:6. Once in his home, Labrecque pointed out the location of the Polaroid camera Hunt would use to photograph J. with Juliette. E.R. 208:10-209:12. The jury also heard evidence that prior to and during Hunt's trip to Texas, Labrecque was involved in criminal sexual activity with his own daughters. E.R. 189:12-191:212; S.E.R. 597-649; 653-665. J. Harrod also testified that just before being photographed with Juliette, Michael Labrecque told J. to "Have fun."[32] E.R. 362:10-14; S.E.R. 368:5-10. Labrecque also said something to J. immediately following the photo session, conveying to J. that Labrecque knew what had just happened. E.R. 363:2-4.

Additionally, when J. was young, up to the age of 10, Labrecque ordered J. to participate in "Adam and Eve" days, which required him to run around nude with the other young Labrecque girls. S.E.R. 364:20-366:18. It was not a lengthy reach for jurors to conclude this ritual was designed to further desensitize the young children, including J., in matters involving sex.

---

[32] J. Harrod was unclear as to whether Michael Labrecque's comment was "Have fun," just before the photographing, or "Did you have fun?" just after the photographing occurred. He was certain, however, that Michael Labrecque made the comment. Whether it happened just before or immediately after the photographing, the effect is the same as the comment evidenced Michael Labrecque's prior knowledge that J. was to be photographed with Juliette engaged in sexual activity.

The government also offered evidence Labrecque ordered J. to engage in acts of oral sex with his two daughters,[33] and a sex ritual with himself, Juliette and their 13-year old daughter, S.[34] E.R. 365:21-366:19; S.E.R. 322:3-327:6; 330:22-332:22; 511:21-516:23; 587-589.  While this occurred after J.'s travel to Texas, such conduct evidenced the intent of both Harrod and Labrecque that one of the reasons J. was sent to Texas was so that he could be trained in sexual activity.

Such evidence, when added to the other circumstantial evidence identified above, supported the jury's finding that one of the purposes of J.'s travel was that he engage in unlawful sexual activity, and that both Harrod and Labrecque intended such sexual activity, prior to J.'s travel.  The government acknowledges that one reason for J.'s travel was for home-schooling.  But immoral activity need not be the only purpose of interstate transportation of minor for sexual purposes; it only needs to be one dominant purpose.  United States v. Kinslow, 860 F.2d 963 (9th Cir. 1988)(overruled on other grounds); see also United States v. Fox, 425 F.2d 996 (9th Cir. 1970); United States v. Bonty, 383 F.3d 575 (7th Cir. 2004)(the government need only prove that a "significant" or compelling purpose of the trip –

---

[33]At the age of 14, J. engaged in more than twenty acts of oral copulation with Labrecque's daughter A., who at the time was either 15 or 16 years of age.  S.E.R. 331:15-332:22.

[34]J. testified that in this sex ritual, he was standing in as Harrod's proxy.  S.E.R. 325:25-326:2.

45

not the dominant purpose – was to commit the sexual assault); and

United States v. Vang, 128 F.3d 1065 (7th Cir. 1997)(statute

prohibiting travel in interstate commerce "for the purpose of"

engaging in sexual act with minor does not require government to

prove that illegal sexual activity with minor was single dominant

purpose of interstate travel, but rather, requires proof that

criminal sexual activity with minor was "a" purpose of interstate

travel).  In light of the evidence of Labrecque's own sexual

activities with his girls preceding J.'s trip, as well as the

sexual activity that occurred immediately following J.'s arrival

in Texas[35] and continuing throughout J.'s Texas stay, in addition

to evidence of Harrod's sexual training with a 6-year old J., and

the communications between Harrod and Labrecque preceding J.'s

1991 trip to Texas, the jury could have drawn reasonable

inferences that Michael Labrecque knew at the time of J.'s travel

that one reason for his travel was that he undergo sexual

training.  Common sense supports the conclusion that a person

ordinarily intends the natural and probable consequences of acts

knowingly done or knowingly omitted.  United States v. Beltran-

Garcia, 179 F.3d 1200, 1204-06 (9th Cir. 1999); see also United

States v. Lord, 711 F.2d 887, 892 (9th Cir. 1983)(holding that

there was no error in instructing the jury that "[i]t is

ordinarily reasonable to assume that a person intends the natural

---

[35]To include the production of the sexually explicit images
of J. and Juliette.

46

and probable consequences of acts knowingly done or knowingly omitted).

Therefore, unless the contrary appeared from the evidence – and it did not -- the jury could and obviously did draw the inference that Labrecque intended all the consequences that one standing in like circumstances and possessing like knowledge should reasonably have expected to result from his acts of aiding and abetting Harrod in transporting J. from Sacramento to Texas. In determining the issue of intent, the jury was entitled to consider any statements made and acts done or omitted by the defendant, and all facts and circumstances in evidence which would aid in their determination of his state of mind. <u>Turf Center, Inc., v. United States</u>, 325 F.2d 793,797 n.5 (9th Cir. 1964); <u>see</u> <u>also</u> <u>United States v. Brady</u>, 579 F.2d 1121 (9th Cir. 1978).

Labrecque, however, suggests that the evidence overwhelmingly showed that the "religious" rituals involved sexual activity with girls, not boys, and argues this repudiates the government's assertion Labrecque knew of the sexual training of J. prior to his trip. Def. Brf. at 32-33. The evidence strongly emphasized abuse inflicted upon the girls because all but one of the victims identified in the indictment were girls. Naturally, the evidence would tend to emphasize the plan each man had for their girls. However, that doesn't minimize the evidence showing plans that J. Harrod was to be trained to be a next

47

generation patriarch, and that this plan was hatched and in place at the time of J.'s travel to Texas. As a whole the evidence introduced at trial showed that the defendants had a comprehensive plan for their daughters' and J.'s sexual roles in their religion, roles for which the defendants carefully groomed each child.

Viewing the evidence in a light most favorable to the government, the jury had sufficient evidence to believe that at the time J. traveled to Texas, Michael Labrecque knew that one of the reasons he was to live with the Labrecques was because he was to be trained in the sexual practices of the family's religion so as to later assume the role of patriarch. Accordingly, Labrecque's conviction for Count One should be affirmed.

## III. Harrod and Labrecque Should Be Resentenced by the District Court as to Counts One and Seven Due to a Violation of the ex Post Facto Clause

"[A]n Ex Post Facto violation occurs when a law 'changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.'" United States v. Gianelli, 543 F.3d 1178, 1183 (9th Cir. 2008) (quoting Carmell v. Texas, 529 U.S. 513, 522, 525 (2000) (quoting Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798))). Counts One and Seven charge violations of 18 U.S.C. § 2423(a) that occurred between July 1, 1991 and September 1, 1991, and July 1, 1998 and August 6, 1998, respectively. The district court sentenced the defendants to 15-year terms of imprisonment for these violations. However, the

48

statutory maximum penalty at the time the crimes were committed was 10 years.[36]  For this reason, the government submits that the defendants should both be resentenced as to Counts One and Seven.

IV.  Where Defendants Failed to Show They Lacked the Future Ability to Pay Fines The Imposition of Fines Was Not Error

    A.  Standard of Review

The defendants each objected to the imposition of a $25,000. C.R. 264, 276; E.R. 375; S.E.R. 729:5-7.  The district court's "finding of whether a defendant is able to pay the fine is reviewed for clear error."  United States v. Orlando, 553 F.3d 1235, 1240 (9th Cir. 2009).  "This clear error review is 'significantly deferential,' and [this] court 'must accept the district court's factual findings absent a 'definite and firm conviction that a mistake has been committed.''"  Rhoades v. Henry, 596 F.3d 1170, 1177 (9th Cir. 2010); see also United States v. Syrax, 235 F.3d 422, 427 (9th Cir. 2000).

    B.  The $25,000 Fines Were Not Unreasonable.

Section 5E1.2(a) of the Sentencing Guidelines, though now advisory, provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."  See United States v. Orlando, 553 F.3d 1235, 1239 (9th Cir. 2009).

---

[36] The maximum penalty for a violation of 18 U.S.C. § 2423(a) was increased from 10 years to 15 years on October 30, 1998 as a provision of the Protection of Children from Sexual Predators Act of 1998.  See Pub. L. No. 105-314, Title I, § 103, 112 Stat. 2976.

The defendant bears the burden of proving, by a preponderance of the evidence, that he is unable to pay the fine. Id. at 1240; United States v. Favorito, 5 F.3d 1338, 1339 (9th Cir. 1993).

In addition to considering the sentencing factors set forth in 18 U.S.C. § 3553(a), a district court, "in determining whether to impose a fine, and the amount, time for repayment, and method of payment of a fine ... shall consider" the factors outlined in 18 U.S.C. § 3572(a)(1) through (a)(8). See 18 U.S.C. § 3572(a). The factors pertinent to this case include: the defendant's income, earning capacity, and financial resources; the burden the fine will impose upon any person who is financially dependent on the defendant; whether restitution is ordered; and the expected costs to the government of any imprisonment component of the sentence. See 18 U.S.C. §§ 3572(a)(1), (2), (4), and (6); see also U.S.S.G. § 5E1.2(d). A district court need not address each factor explicitly in its sentencing determination. United States v. Eureka Labs., Inc., 103 F.3d 908, 913 (9th Cir. 1996). Rather, if the record in its totality indicates that the district court considered the factors, the findings are adequate. Id. at 913-14. Additionally, a district court may adopt the factual findings contained in a defendant's presentence report to support the imposition of a fine. See United States v. Ladum, 141 F.3d 1328, 1344, 1345 (9th Cir. 1998); United States v. Schubert, 957 F.2d 694, 697 (9th Cir. 1992).

      1.    The PSRs and the Information
          <u>Upon Which the District Court Relied</u>

The defendants chose not to speak with the probation officer, Labrecque P.S.R. ¶ 137, Harrod P.S.R. ¶ 66, so the presentence reports do not contain any recent financial information and the defendants' statements in their 2004 CJA financial affidavits could not be confirmed.

The district court adopted the statements in Labrecque's presentence report. S.E.R. 722:9-10. Harrod, in his formal objections, "move[d] to strike the entire presentence report," E.R. 375:20-21, and the district court noted at sentencing that "[t]he way I read your objections, there's hardly anything left in the presentence report after I get through all your objections." S.E.R. 723:6-8. After discussion with counsel, <u>see</u> S.E.R. 723-728, the district court resolved this issue and identified that information upon which it would rely:

> The Court will not strike any particular sentences or paragraphs from the presentence report. However, the Court will state that it relies primarily upon the evidence presented at trial and the evidence presented at this sentencing hearing in arriving at its evaluation of the offense.
>
> The Court does look to the presentence report in arriving at its evaluation of the history and characteristics of the defendants insofar as the presentence report contains historical information. However, the Court does not rely upon any other so-called bad acts that may be described in the presentence report which were not the subject of the testimony at trial. That's the best way to summarize what the Court is considering in arriving at its sentence in the case.

S.E.R. 728:6-20.  The fine for each defendant is part of the judgment and sentence, and the district court identified the information upon which it would be relying when deciding what sentences it would impose on the defendants.  Thus, the record in its totality indicates that the district court considered the factors when deciding whether to impose fines and in what amounts.

> 2.    The Defendants' Income, Earning
>       Capacity, and Financial Resources

The defendants' arguments address only their alleged indigency at the time of sentencing and ignore their future ability to pay the fines.  Moreover, the information in support for their arguments is weak, outdated, and unconfirmed.  Because the defendants affirmatively chose not to provide financial information to the probation officer, they should not now be rewarded for their lack of candor.

> a.   Defendant Harrod

On April 1, 2004, Harrod signed a single-page "Financial Affidavit" so that he could be represented by appointed counsel.  E.R. 371.  The financial affidavit lists a completely different district court case number and identifies the charges as fraud and money laundering-based, as opposed to the child exploitation charges with which he was charged.  Id.  Under the "Other Income" section, Harrod:  1) claims that he received $1,000; 2) does not identify the source of the funds or the frequency of such income;

52

and 3) notes, "This (all but $200) goes to child support." This money is, perhaps, the military pension that counsel references in his official objections to the presentence report, C.R. 276; E.R. 412. In Harrod's P.S.R., the probation officer writes, "The defendant told the Sacramento County probation officer he receives $900 per month from his military retirement. The defendant provided no further information regarding his financial condition." Harrod P.S.R. ¶ 153. There is no certified or even written record from Sacramento County to identify what was provided or told to the county probation office or when this occurred.

Defendant Harrod also indicates in the Financial Affidavit that he does not have any money in a savings or checking account. E.R. 371. However, the military pension must have been deposited somewhere, and as Harrod noted previously, not all of the income went to "child support." <u>Id.</u> As well, there is no information about whether Harrod continues to receive his military pension. <u>See</u> Harrod P.S.R. ¶ 154 ("Since the status of the military pension is unknown and no information was provided by the defendant regarding his financial condition, it is believed a fine should be imposed, as the defendant has not demonstrated an inability to pay a fine...."").

Finally, in the Financial Affidavit under "Obligations and Debts", Harrod reports "8" dependents but does not list them as required. E.R. 371. As demonstrated in subsection 3, below,

that number is not correct. With regard to debts, Harrod again
ignores the instruction on the form and writes generally, "Too
many to list" and the seemingly arbitrary amount of "$20,000".
Id. No creditors are identified and no information was provided
to the probation officer or the court as to whether these debts
were paid, discharged, written off, or resulted in judgments
against Harrod. Harrod's appointed counsel never submitted a
declaration indicating that the financial information contained
in the affidavit was checked and/or corroborated at any time.
The Financial Affidavit is woefully inadequate, and the fact that
Harrod did receive appointed counsel should not be "proof" that
the Financial Affidavit was correct in 2004 or that it was
accurate and truthful in 2008 at the time of sentencing. As
Application Note 3 to U.S.S.G. § 5E1.2 states, appointment of
counsel is a "significant indicator" of a present inability to
pay a fine, but this appointment occurred four years prior to
sentencing and no other financial information was provided since
that time. As a result, the significance of the Financial
Affidavit is greatly diminished.

> b. <u>Defendant Labrecque</u>

Similarly, Labrecque signed an (undated) single-page
Financial Affidavit to secure appointed counsel. E.R. 372. This
financial affidavit is also inadequate to establish inability to
pay a fine.

While Labrecque had employment prior to his incarceration, and he and his wife seemingly earned $2,900 per month, Labrecque noted that he did not have money in a checking or savings account. Id. Labrecque identified three vehicles as assets, id., but the only information his counsel provided to the probation officer was that they had been "sold" with no details provided concerning monies received. See Labrecque P.S.R. ¶ 146.

Regarding Labrecque's "Obligations and Debts", he too notes "8" dependents but does not identify them. As discussed in the subsection below, it appears that Labrecque does not have any dependents at this time. The monthly bills identified, for instance, rent and groceries, would all have, and did, become zero upon incarceration.

At sentencing the district court pointedly questioned Labrecque's counsel about the lack of information regarding the defendant's finances: "[I]f no financial information is provided, how can you expect the Court to make an intelligent determination as to whether he can afford to pay a fine?" S.E.R. 730:17-20. The court further commented that Labrecque might have some holdings, and explained,

> You see, as I understand the fine provisions, there is
> if not a presumption, there is an inference that the
> defendant should pay a fine. And when the Court
> doesn't impose a fine it's because the Court makes a
> finding that the defendant is unable to pay a fine. If
> you don't give the Court any information as to whether
> the defendant is or is not able to pay a fine, why
> shouldn't the Court impose the fine?

S.E.R. 730:24-731:6.  Labrecque's counsel indicated that she advised the defendant "not to give any information at all while the possibility of appeal exists."  S.E.R. 731:7-9.  The district court responded that "there's a difference between him talking and you giving the Court information about his financial status."  S.E.R. 731:10-12.  Counsel then raised the issue that Labrecque qualified for appointed counsel and that he owned no property.  The district court found that information insufficient.  <u>See</u> S.E.R. 731:13-21.  This Court should do the same.

### 3.   The Defendants Fail to Demonstrate a Fine Would Create a Burden for Dependents

In the defendants' financial affidavits, each stated they had eight dependents.  E.R. 371, 372.  Those numbers are no longer accurate.

All of the defendants' victims in this case have reached majority age.[37]  However, the government believes that currently there are a total of four children under the age of 18 who are directly related to Allen Harrod.  Two of those children, conceived by Allen Harrod and Juliette Labrecque (wife of defendant Michael Labrecque), B. and L., have been adopted and

---

[37]This fact nullifies the defendants' argument that "[t]he interests of the dependents in this case were especially important given that many of them were victims of the offenses." Def. Brf. at 38.  It appears that the defendants are trying to use their victims again, in this sense, to lessen their punishments.

are no longer dependents of Allen Harrod.[38]  There is a daughter

of the union of Allen Harrod and Irene Hunt, D., who is

approximately 16 years old.  She is being cared for by an adult

stepsister.[39]  Finally, there is a daughter of the union of Allen

Harrod and A. Labrecque (the then-teenaged daughter of defendant

Michael Labrecque).  This child may be under the care of the

State of Iowa, but if not, she is supported by Angela Labrecque

who is the mother of this child by Harrod.[40]  Thus, Allen Harrod

may have only one dependent, and Michael Labrecque has none.

Defendants did not provide the district court or the

probation officer with updated information regarding the number

and identity of any dependents.[41]  Moreover, defendants have not

---

[38]Government Counsel has spoken with the Iowa Public Service
representative overseeing adoptions and foster care who confirmed
B. and L.'s adoption.

[39]The government is aware of the custody status of Hunt and
Harrod's daughter through contacts with knowledgeable family
members who have assumed care of D.

[40]Michael Labrecque acknowledged this child was the product
of his daughter A. and Allen Harrod, but stated his daughter was
an adult at the time the child was conceived.

[41]This is different from the situation in United States v.
Sager, 227 F.3d 1138 (9th Cir. 2000), cited by the defense as
support for its argument that the district court must address the
burden on dependents.  See Def. Brf. at 37-38.  In Sager, the
defendant informed the court of his financial holdings, and the
record indicated that the only way Sager could pay the fine and
support his wife and two children "would have been to cash in a
life insurance policy intended to benefit the family in the event
of his death."  Sager, 227 F.3d at 1147.  In this case, neither
Harrod nor Labrecque provided a complete financial disclosure to
the district court or the probation officer.  As a result, Sager
is not suitably analogous.

demonstrated that they have provided, or have been ordered to provide, any financial assistance to any dependents.  For this reason, the defendants should not be permitted to argue that fines would burden any dependents.

    4.   There Was No Restitution Ordered in This Case

      Section 3572(b) of Title 18 of the United States Code instructs that the imposition of a fine should not impair a defendant's ability to make restitution.  The section reads:

> If, as a result of a conviction, the defendant has the obligation to make restitution to a victim of the offense, other than the United States, the court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution.

18 U.S.C. § 3572(b); see United States v. Ortland, 109 F.3d 539, 549 (9th Cir. 1997).  In this case, neither defendant has been ordered to pay restitution.  See E.R. 380, 385.  Therefore, a $25,000 fine imposed upon each defendant is particularly appropriate.  See United States v. Orlando, 553 F.3d 1235, 1240 (9th Cir. 2009)(affirming $30,000 fine under clear error standard and noting the district court's statement of the appropriateness of the fine given the lack of restitution).

    5.   Expected Costs of Imprisonment

      In determining the fine amount, the district court must consider the government's expected costs of imprisonment.  See 18 U.S.C. § 3572(a)(6); U.S.S.G. § 5E1.2(d)(7); cf. United States v. Tapia-Romero, 523 F.3d 1125, 1128 (9th Cir. 2008) (holding that

the "express inclusion of cost of imprisonment as a consideration in § 3572(a) thus demonstrates that cost of imprisonment is not a consideration under § 3553(a)"). This Court holds that a fine to cover the cost of imprisonment is consistent with two of the sentencing purposes of the Sentencing Reform Act - just punishment and deterrence. United States v. Zakhor, 58 F.3d 464, 465 (9th Cir. 1995) (discussing U.S.S.G. § 5E1.2(i), then in effect and requiring the sentencing court to "impose an additional fine amount that is at least sufficient to pay the costs to the government of any imprisonment ... ordered"). The Zakhor court went on to hold that such a fine does not violate the Due Process Clause because it bears a rational relationship to a legitimate government purpose. Id. at 467.

At the sentencing hearing, the district court stated that the nature and circumstances of the offenses were considered to be "one of the most serious offenses that the Court has had occasion to witness." S.E.R. 734:6-9. The court made it very clear that its intention was that the defendants never be released from custody. S.E.R. 736::22-737:6 and 737:24-738:1. The court explained that it was not imposing any terms of supervised release because "I don't want to suggest that I believe that there is any circumstance under which the defendant[s] would be released." S.E.R. 737:1-3, 24-25.

While not stated explicitly, the $25,000 fines for each defendant could easily be inferred as fines to cover the cost of

59

incarceration, given that the defendants were sentenced to terms of life imprisonment. The cost of life imprisonment was surely contemplated, and, as noted above in subsection B, the district court is not required to explicitly address each factor identified in 18 U.S.C. § 3572(a).

### C. The Defendants Failed to Demonstrate They Lacked the Future Ability to Pay the Imposed Fine

In order to avoid the fine contemplated by U.S.S.G. § 5E1.2(a) and 18 U.S.C. § 3571(a), Harrod and Labrecque had to prove by a preponderance of the evidence that they had no current or future ability to pay a fine. United States v. Ladum, 141 F.3d 1328, 1344 (9th Cir. 1998). A district court may fine a currently indigent defendant if it finds that he has the earning capacity to pay the fine in the future. United States v. Orlando, 553 F.3d 1235, 1240 (9th Cir. 2009) (citing Ninth Circuit cases). Where defendants failed to address their future ability to pay the fines imposed, they should not prevail on their demand to have the fines summarily stricken from the sentences. See Def. Brf. at 39.

### 1. The Defendants Can Participate in the Inmate Financial Responsibility Program

The defendants have the capacity to work while incarcerated. They have an ability to pay down their fines by participating in work programs.

This Court has "implicitly endorsed" the Inmate Financial Responsibility Program (IFRP) "by holding that a district court

60

did not err in imposing a fine based on the inmate's future ability to pay the fine through the IFRP." <u>Montano-Figueroa v. Crabtree</u>, 162 F.3d 548, 549 (9th Cir. 1998) (<u>per curiam</u>); <u>see also</u> <u>United States v. Quan-Guerra</u>, 929 F.2d 1425, 1427 (9th Cir. 1991)(noting that defendant has prison employment and no impediment to his earning capacity has been demonstrated). Moreover, in <u>Montano-Figueroa</u> this Court concluded that 18 U.S.C. § 3572(d) is not a bar to a prison's diversion of part of an inmate's wages to pay a court-ordered fine.  162 F.3d at 550.

In <u>United States v. Haggard</u>, 41 F.3d 1320, (9th Cir. 1994), the defendant, who was then imprisoned in Indiana for a burglary conviction, made false statements to the FBI about the whereabouts of a missing little girl and ultimately led them on a "four-hour, 100-mile wild goose chase" around the San Francisco Bay area.  <u>Id</u>. at 1323-24.   Haggard was sentenced to 78 months' incarceration, and was ordered to pay $6,386 in restitution and a fine of $4,000.  <u>Id</u>.  This Court affirmed Haggard's sentence, and with respect to the fine held:

> Even accepting [Haggard's argument that he was
> destitute at the time of sentencing] as true,
> we note that Haggard made no showing of future
> inability to pay.  In fact, as the district
> court found, Haggard can earn the money to pay
> a fine by working in the Inmate Financial
> Responsibility Program while incarcerated.  A
> court may fine a presently indigent defendant
> if it finds that the defendant has sufficient
> earning capacity to pay the fine in the future.
> The district court did not err in imposing the fine.

Id. at 1329 (citing United States v. Favorito, 5 F.3d at 1338, 1339 (9th Cir. 1993).

The defendants in this case have the ability to pay a fine by working during their lifetime terms of incarceration. The Court should affirm their fines as reasonable.

    2.    Circuit Courts Have Affirmed Fines Imposed on Defendants Serving Life or Lengthy Sentences

Notably, the length of the defendants' sentences does not negatively affect the imposition of a fine. Circuit courts have affirmed the imposition of fines on defendants serving life sentences. See, e.g., United States v. Yeje-Cabrera, 430 F.3d 1, 5 (1st Cir. 2005)(30 years' imprisonment and $4 million fine); United States v. Tocco, 135 F.3d 116, 122-23 (2d Cir. 1998) (435 months' imprisonment and approximately $3 million fine); United States v. Bauer, 129 F.3d 962, 963 (7th Cir. 1997)(five concurrent life sentences, $175,000 fine, and $47,860.13 restitution); United States v. Seale, 20 F.3d 1279, 1282 (3d Cir. 1994)(for male defendant, 95 years' imprisonment and $1.75 million fine); United States v. Hyppolite, 65 F.3d 1151, 1155 (4th Cir. 1995)(life imprisonment and $300,000 fine).

## CONCLUSION

For the foregoing reasons, the United States submits that Allen Harrod's and Michael Labrecque's convictions and sentences

should be affirmed, with the only exception that each should be resentenced on Counts One and Seven.

DATED: October 28, 2010

                                    BENJAMIN B. WAGNER
                                    United States Attorney


                          By:   /s/ Laurel D. White
                                /s/ Ellen V. Endrizzi

                                LAUREL D. WHITE
                                ELLEN V. ENDRIZZI
                                Assistant U.S. Attorneys

<u>STATEMENT OF RELATED CASES</u>

    The government is not aware of any cases related to this appeal.

DATED: October 28, 2010        <u>/s/ Laurel D. White   </u>
                                      Assistant U.S. Attorney

                                      <u>/s/ Ellen V. Endrizzi  </u>
                                      ELLEN V. ENDRIZZI
                                      Assistant U.S. Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Ninth Circuit Rule 32(a)(5)(B), I certify that the Brief for Appellee is monospaced, does not contain more than 10.5 characters per inch, and contains 15,358 words.

DATED: October 28, 2010

/s/ Laurel D. White
Assistant U.S. Attorney

/s/ Ellen V. Endrizzi
ELLEN V. ENDRIZZI
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

When All Case Participants are Registered for the
Appellate CM/ECF System

I hereby certify that on October 28, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ LAUREL D. WHITE
LAUREL D. WHITE